James A. GAINEY and J. L. Young, individually and on behalf of others similarly affected, Plaintiffs,

v.

The BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES,

and

the Pennsylvania Railroad Company, Defendants.

Civ. No. 32898.

United States District Court
E. D. Pennsylvania.

Sept. 5, 1967.

See also D.C., 34 F.R.D. 8.

Lawrence J. Richette, Frank F. Truscott, Philadelphia, Pa., for plaintiffs.

Allen S. Olmsted, 2nd, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Brotherhood of Railway and Steamship Clerks.

Robert M. Landis, Dechert, Price & Rhoads, Philadelphia, Pa., for Pennsylvania Railroad Co.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

SHERIDAN, Chief Judge, Middle District of Pennsylvania, Sitting by Special Designation.

This is an action pursuant to the Railway Labor Act, 44 Stat. 577, as amended, 45 U.S.C.A. § 151 et seq. by plaintiffs, former employees of The Pennsylvania Railroad Company (Railroad), against the Railroad and against The Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees (Brotherhood), for damages for breach of the duty of fair representation, and for certain injunctive and declaratory relief. The court has jurisdiction of the subject matter and the parties.

This is the third action plaintiffs have brought in this court against the defendants. The first complaint, filed on March 26, 1959, was dismissed against the Brotherhood because plaintiffs failed to plead the exhaustion of their remedies within the Brotherhood or an adequate reason for failure to do so. Gainey v. Brotherhood of Railway & Steamship Clerks, E.D.Pa.1959, 177 F.Supp. 421, aff'd 3 Cir. 1960, 275 F.2d 342, cert. denied, 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153. The second complaint, filed on June 17, 1960, was dismissed against the Brotherhood for failure to plead hostile discrimination. Gainey v. Brotherhood of Railway & Steamship Clerks, E.D.Pa.1961, 199 F.Supp. 477, aff'd 3 Cir. 1963, 313 F.2d 318. Both complaints were also dismissed against the Railroad. After the present action was started on February 19, 1963, the Brotherhood and the Railroad obtained a stay of proceedings until the plaintiffs paid the costs of the first two actions. Plaintiffs paid the costs to the Brotherhood, but not to the Railroad, and there have been no further proceedings against the Railroad. Subsequently, the Brotherhood filed a motion to dismiss the present complaint for a number of reasons, one of which was that "the complaint does not sufficiently allege bad faith or hostility toward the group for which plaintiffs purport to speak." By order filed on May 18, 1964, the late Judge Allan K. Grim denied the motion. In an accompanying opinion D.C., 230 F.Supp. 678 Judge Grim concluded that the following paragraphs of the complaint, which were not pleaded in either of the prior actions, satisfied the requisite allegation of a breach of the duty of fair representation grounded on bad faith and ill will.

"XV

"The defendant union, contrary to the Railway Labor Act, is hostile toward the membership of the Philadelphia locals, where the bulk of the herein tallymen are located because of the latter's opposition toward the General Chairman and the staff of the union's System Board and the Internation [sic] President and the staff of the Grand Lodge of the union.[1]

1. Plaintiffs' brief suggested a second motive: "In 1952 the carrier terminated the tonnage at the Philadelphia Transfer and Loehr got nothing for it. The logical inference to be drawn is that Loehr accepted the closing of the station in 1952— two or three months before this union and the Pennsylvania Railroad entered into a union shop agreement, which forced 23,000 railroad workers in this craft to pay homage to this union for as long as the workers remained on their jobs. It could very well be that this was the consideration for allowing the carrier to close the station without receiving any quid pro quo for the workers by way of equalization of rates. The consideration for the closing of the Transfer flowed to the union coffers—not in the pay envelopes of the Tallymen on the Eastern Region."

"XXIII

"The defendants acting individually and in concert by acts of omission and commission planned a course of conduct designed to discriminate against Eastern Region Tallymen so that their pay scale would be approximately twenty-five dollars a month less than tallymen employed in the Central Region of the carrier; and this discrimination was agreed upon as a means of punishing the plaintiffs and other members of the defendant union in the Eastern Region for their opposition to the union leadership; * * "

The trial was to the court without a jury. Since plaintiffs' proof of damages obviously would involve protracted and extensive discovery and require testimony from an unusually large number of witnesses, only the issue of the Brotherhood's liability was tried. Rule 42(b), Fed.R.Civ.P.

Plaintiffs were tallymen employed at the Philadelphia Transfer Station (Philadelphia Transfer) in the Philadelphia Terminal Division, a part of the Railroad's Eastern Region, which generally included the stations East of Altoona, Pennsylvania. In 1937 the Brotherhood obtained the collective bargaining rights for their craft, which also included truckers and loaders. Plaintiffs' principal charges of discrimination are:

1. In 1941, the Brotherhood negotiated a wage agreement for Eastern Region tallymen based on hourly rates plus incentive pay. Tallymen in the Central Region (stations West of Altoona to Chicago) were on salary which netted them about $42.27 a month more, and, in addition, received vacation pay and sick leave, which were not payable to hourly rate workers.

2. In January of 1949, the Brotherhood served the Railroad with a Section 6 notice under the Railway Labor Act, together with a proposal for a new wage agreement which eliminated certain wage inequities between tallymen and truckers and loaders under the 1941 agreement, and then failed to seek an injunction when the Railroad terminated the existing agreement.

3. On April 18, 1950, the Brotherhood negotiated a new wage agreement for all tallymen in the Eastern Region and failed to enforce it.

4. The Brotherhood permitted the Railroad to close Philadelphia Transfer in June of 1952, thereby terminating the existing wage agreement, without seeking injunctive relief under the Railway Labor Act, which would have preserved the status quo pending negotiation, mediation, arbitration and Presidential intervention.

The Brotherhood is the largest of the railroad unions, representing crafts on more than 99 percent of the railroads in the United States and Canada. It adapts itself, geographically and organizationally, to the railroad so that it has a unit corresponding to each unit in the railroad. In 1950–52, the Brotherhood had 100 lodges of employees of The Pennsylvania Railroad. Each lodge had a Protective Committee headed by a chairman (local chairman). The members of Lodge 100, one of five lodges in the Philadelphia Terminal Division, were employees of Philadelphia Transfer. When there were two or more lodges in a division, the lodge chairmen elected a Division Chairman. The System Board of Adjustment, of which all Division Chairmen were members, elected the General Chairman, who since 1941 has been S. V. W. Loehr. The national headquarters of the Brotherhood, called the Grand Lodge, is at Cincinnati. The Grand President was George M. Harrison until he retired in 1963. He had a staff which in 1950–52 included two Vice Grand Presidents, F. H. Hall and G. B. Goble; Mr. Kinley, of the grievance and agreements section, and Mr. Crawford, counsel.

Grievances were adjusted at the lowest level of the Brotherhood and its railroad counterpart, with the right of appeal to the next highest level, as follows:

| Brotherhood | Railroad |
|---|---|
| Local Chairman | Freight Agent |
| Division Chairman | Division Superintendent |
| General Chairman | Regional General Manager |

A grievance reached the General Chairman either by a "joint submission," i. e., an agreed statement of facts and the contentions of the two parties, prepared by the Division Chairman in consultation with the Division Superintendent, or by an "ex parte" statement of the Division Chairman when the Division Superintendent refused to sign a joint submission. The General Chairman was required to list it on the agenda for the next monthly meeting, or advise the Division Chairman it had no merit, giving his reasons. The Division Chairman had the right to appeal to the appropriate committee of the System Board. If the General Chairman were reversed, he was required to present the grievance to the General Manager. If the General Chairman were sustained, the Division Chairman or the claimant could appeal to the Grand President, and from the Grand President to the Grand Executive Council. The General Chairman could recommend that a grievance rejected by the General Manager be taken to the Third Division of the National Railroad Adjustment Board, a federal agency. If the Grand President approved, it would then be briefed and argued and decided in what is termed an "award." Generally, the negotiation of new contracts or the changing of contract provisions was the responsibility of the General Chairman or his staff when only Pennsylvania Railroad employees were concerned. It was the responsibility of the Grand President and his staff when the employees of other railroads were also concerned. Thus, Loehr, as General Chairman, was responsible for representing member crafts not only of the Railroad's Philadelphia Terminal Division, but of all divisions of the Railroad, while the Grand President's office was concerned with employees of the various crafts on all the railroads who were members of the Brotherhood.

The parties have been in litigation for many years. The principal figures have been Loehr, the General Chairman, and Joseph P. Zawada, Division Chairman of the Philadelphia Terminal Division, and also Local Chairman of Lodge 100. Zawada had 6500 men under him. He served as Division Chairman from 1942 until 1954, and from February 1954 until July 1956 he acted jointly with J. C. McGuigan, Acting Division Chairman, under the terms of a court order. In addition to the above actions, two other proceedings are relevant. On February 5, 1954, the Grand Lodge, having revoked the charters of four lodges of the Philadelphia Division (including Lodge 100) for failure to transmit the per capita tax of the members, filed a complaint in equity in the Common Pleas Court of Philadelphia for an order requiring the lodges to surrender all their books, records and funds to the Grand Lodge. The lower court found for the defendants and reinstated the charters of the four lodges. The Supreme Court of Pennsylvania reversed the order of reinstatement and granted the requested relief. Grand Lodge, Brotherhood of Railway & Steamship Clerks v. Girard Lodge 100, 1956, 384 Pa. 248, 120 A.2d 523. In 1951 the Grand President instructed the two Vice Grand Presidents to go to Philadelphia and make

"* * * a full and complete investigation of all of the files of both Brothers Zawada and Loehr pertaining to all pending and unsettled grievances

referred to above, and to determine the status of each respective grievance and whether the method and procedure adopted by both Brothers Zawada and Loehr, and their handling thereof, are in conformity with the grievance procedure under the prevailing agreements on this Railroad and the Brotherhood's Protective Laws. * * *"

After hearing, the Vice Presidents on January 25, 1952, reported to the Grand President that the delays were generally attributable to Zawada. The Grand President gave Zawada an opportunity to reply, which he did in considerable detail on April 29, 1953. The matter ended here. The full record of this proceeding, including the report of the Vice Presidents and Zawada's reply, was admitted in evidence in this trial.

One of the activities at Philadelphia Transfer was the transfer of less than carload freight from one freight car to another for forwarding to destination. This work was performed by "gangs" consisting of a tallyman, a loader and truckers. The tallyman checked the freight against shipping documents as it was removed from the first car. Under a 1941 agreement negotiated by the Brotherhood and the Railroad, tallymen were paid higher wages than loaders or truckers. Pay was computed on an hourly basis with an incentive known as "tonnage." Incentive was payable to tallymen when the tonnage handled in a day by a gang exceeded 35.14 tons (70,280 pounds). The tonnage rate was 14 cents, computed by dividing the normal daily wages of $4.92 (61½ cents per hour by 8 hours) by the minimum tonnage of 35.14. Thus, in addition to his normal daily wage of $4.92, a tallyman received 14 cents for every ton over 35.14 tons handled in a day.

Loaders and truckers received a lower hourly rate than tallymen, and were required to handle more tonnage to receive incentive pay. The various rates and tonnage as originally established were:

| | Hourly Rate | Tonnage Rate | Tons Handled Before Incentive Was Effective |
|---|---|---|---|
| Tallymen | .615 | .14 | 35.14 |
| Loaders | .60 | .1144 | 42 |
| Truckers | .58 | .4425 | 42 |

While in years subsequent to 1941 the hourly rates were adjusted, no changes were made in the tonnage requirements.

The tonnage arrangement was unsatisfactory. Zawada began to get complaints as soon as he assumed office in 1942. Truckers and loaders were dissatisfied with the lower rates, and the higher tonnage. There were inequities among the various gangs in the opportunity to earn tonnage. Gangs assigned to mail order shipments with its many and small packages going to divers destinations could not handle 35 tons in a day. Gangs assigned to heavier freight, such as canned goods, pipe, or structural steel, could exceed 35 tons. Also, items such as steel and pipe were handled by a crane, whereas most other items were handled by hand. Finally, the inequities were complicated because one might be a tallyman one day and a loader the next. These inequities were a source of agitation and brought about charges of favoritism in the allotment of work.

Tallymen at Philadelphia Transfer learned that tallymen at Trenton received higher tonnage rates, and agitated for equalization. Later, they learned that Central Region tallymen, especially those in Pittsburgh, were on salary and received higher monthly income, and vacation and sick pay, which they did not receive, and agitated for the same. Load-

ers and truckers, on the other hand, agitated for equalization of tonnage with the tallymen. Not all tallymen were dissatisfied since about fifteen percent earned tonnage and some members of the crane gangs earned as much as the superintendent. Loehr undertook to revise the 1941 agreement as it applied to Philadelphia Transfer and the 52nd Street Station.[2] On July 21, 1948, he forwarded Zawada a copy of a proposed agreement, to be effective March 1, 1949, with the request that he review it with the membership. This agreement attempted to rectify some of the inadequacies of the 1941 agreement; it reduced the tonnage for truckers and loaders to 35.14 tons, and set up machinery to eliminate favoritism and other problems, but did not provide for the equalization of pay and benefits for the Eastern Region tallymen with those of the Central Region. Zawada approved and the proposal was submitted to management, which on August 17, 1948, met with the Brotherhood to discuss it. Management suggested that the 52nd Street Station be put under the jurisdiction of another agent and that tonnage be eliminated. Loehr replied that management was working at cross purposes since the Brotherhood had already proposed a new tonnage agreement. Following the meeting Zawada, who had attended, expressed concern about management's intended changes at 52nd Street. Zawada requested that at the next meeting on September 14, 1948, Loehr "submit as a counter proposal a request that the tonnage agreement be made to cover Federal Street, South Philadelphia Freight, Walnut Street Freight, Kensington District and Broad & Washington Avenue Freight Station and stations under jurisdiction of said Agent. This will keep them in conference long enough to let well enough alone. We have to do this because what the Carrier is trying to do is eliminate tonnage at a cream point (52nd Street) which will aggravate the membership at that point. I will further consult with you on Tuseday." Thus, at this point Zawada, while undoubtedly still concerned with the inequalities in the tonnage agreement, was interested in continuing them rather than in changing to Central Region rates.

On January 21, 1949, the Brotherhood served the Railroad with a Section 6 notice under the Railway Labor Act in which it proposed to abrogate the tonnage agreement of 1941, and substitute the new tonnage agreement which had been approved by Zawada. At a meeting on February 15, 1949, attended by Zawada, the proposal was discussed item by item and management took it under consideration. There were several subsequent meetings but no agreement was reached. Management resisted the changes in the proposal and the Brotherhood resisted any change at 52nd Street. On February 21, 1950, Loehr demanded either a formal acceptance or a counter proposal. On April 7, 1950, the Railroad formally rejected the proposal, requested that tonnage also be eliminated at Philadelphia Transfer and suggested that the matters be discussed following the next regular meeting on April 18, 1950. These arrangements were made and Loehr advised Zawada and invited him to submit his suggestions prior to the meeting. There is a dispute as to what transpired on April 18, 1950. The Brotherhood's version is that: the regular meeting was held between 10:00

2. In 1941 the 52nd Street Station handled only a small amount of platform tonnage and was under the jurisdiction of the Agent at Philadelphia Transfer. It was the practice to send a gang from Philadelphia Transfer to 52nd Street Station for a few hours a day to handle the tonnage. The same tonnage rates were in effect at both stations. In subsequent years the 52nd Street Station tonnage greatly increased so that it attained a separate identity as a freight transfer point, but Brotherhood members were subject to the same tonnage formula that applied to Philadelphia Transfer. 52nd Street was considered a desirable station because the freight there was heavy and cranes were in use more than at Philadelphia Transfer.

A.M. and 12:12 P.M. in room 298 of the 30th Street Station in Philadelphia and was attended by Loehr, Zawada and others for the Brotherhood, and Mr. Alexander, Eastern Region Superintendent of Labor and Wages, and other railroad officials, not including Mr. Stewart, Eastern Region Superintendent of Stations and Transfers; only regular grievances and claims and a joint study of Philadelphia ticket offices were discussed; tonnage was not discussed; during the lunch hour after the meeting Loehr chanced to meet Stewart on the main floor of the 30th Street Station and at that time Stewart asked Loehr if he would agree to abolish tonnage at the Philadelphia Transfer; Loehr replied that he would for a price— the extension of Central Region rates at the Pittsburgh 11th Street Station to tallymen all over the Eastern Region; Stewart was agreeable but indicated the approval of his superiors was required; Mr. Nancarrow, Eastern Region General Manager, was the only one who had the authority to approve the proposal; Loehr immediately communicated the proposal to Zawada who called a meeting of the Philadelphia Terminal Grievance Committee which gave its approval; Loehr then called Alexander's office to inform him that the proposal had been made because Alexander, as well as Stewart, was an advisor to Mr. Nancarrow; Alexander was absent but Loehr spoke with the chief clerk who stated that it would go through if his superiors approved.

Plaintiffs argue that the offer was made by Stewart at the regular meeting, that Alexander was present and that he and Stewart had the authority to and did enter into a binding oral agreement, which was confirmed by Loehr in a letter to Nancarrow on April 21, 1950. This version is based largely on the testimony of Zawada.

Mr. Alexander testified that on the afternoon of April 18, 1950, and not at the regular meeting, the substance of the lunch hour conversation between Stewart and Loehr was discussed in his office by Loehr and Kershaw for the Brotherhood

and Stewart and Alexander for the Railroad. At that time Stewart did not indicate that he had approved Loehr's proposal. Alexander agreed to take it under consideration. Loehr did not remember this meeting, but did not deny that it may have taken place.

The testimony of Loehr, Alexander, Stewart and J. C. McGuigan, the Brotherhood's Assistant General Chairman for the Eastern Region, support the Brotherhood's version. The minutes of the regular meeting, prepared by McGuigan, consisting of six closely typed pages, list those present, the various subjects discussed, each of which had a docket number, and quote statements of the participants. Stewart is not recorded as present, and there is no reference to tonnage or to Stewart or to his proposal. Plaintiffs stress acceptance of their version only on the basis that everybody but Zawada perjured himself at the trial. The Brotherhood's version is more credible. The Stewart proposal was made at the lunch hour meeting when Alexander was not present; it was not made at the regular meeting.

 That there was neither an offer or binding agreement is clearly indicated by subsequent events. In a letter to Loehr on April 19, 1950, Zawada spoke of "this proposed change," and of certain clarifications and alternatives, particularly with respect to paid holidays. On April 21, 1950, Loehr wrote to Nancarrow, not to Alexander or Stewart, outlining the proposal, which Loehr referred to as a "suggestion," to drop tonnage and to substitute the Central Region salary of $269.17 a month plus benefits. The letter concluded: "Will you please advise if you concur." Nancarrow did not reply until October 10, 1950, when he wrote Loehr: "In our opinion, the question of eliminating the tonnage rates of pay at the Philadelphia Transfer should not be involved in the handling of Tallymen's rates of pay all over the entire Eastern Region, and such matters should not be handled as concurrent subjects."

Until the closing of Philadelphia Transfer, Loehr continually sought advice from

the office of the Grand President on whether the Brotherhood should strike, seek mediation under the Act, or take other steps to force the Railroad to act. He was advised to continue to negotiate. On November 7, 1950, he formally rejected Nancarrow's reply of October 10, 1950, and called for acceptance of the April 21 proposal. Although on many occasions Loehr sought a reply, none was given. Alexander testified that after the April 18, 1950, meeting, the Railroad explored the Brotherhood's proposal to apply Central Region rates to the Eastern Region. It found that there was not just one Central Region rate, but a variety of them, about nine, and Loehr was attempting to obtain the highest to apply to all tallymen, regardless of the station size; that this would prove extremely costly to the Railroad; and that as a result, the Railroad lost interest. In the meantime, the Railroad determined that Philadelphia Transfer was not needed as a freight transfer point and decided to close it effective June 30, 1952.

■ On June 12, 1952, after Zawada had been notified that the Railroad intended to close Philadelphia Transfer, he wrote Loehr to *"proceed with negotiations in connection with the proposed adjustment of tonnage rates and/or the equalization of Tallymen's rates at the Philadelphia Transfer, Philadelphia Terminal Division and the Eastern Region."* (Emphasis supplied.) In a separate letter of the same date, he advised Loehr that during a June 10, 1952, meeting between Brotherhood representatives and the Railroad's General Manager's staff, he, Zawada, advised Railroad personnel that upon the closing of Philadelphia Transfer, the Railroad would be confronted with many claims because: "(a) The July 19, 1941, Tonnage Agreement *was not terminated by either party and is still in effect.* Under terms of that Agreement, a 30-day notice must be given either to amend, adjust, or terminate the agreement. (b) For the past several years, General Chairman S. V. W. Loehr and/or the staff, together with

responsible officers of the Pennsylvania Railroad Company were negotiating a tonnage rate for the Philadelphia Transfer. They were further negotiating a proposed equalization of rates involving Tallymen, not only at the Philadelphia Transfer, but the Philadelphia Terminal Division and the Eastern Region. These conferences or negotiations were not concluded and are still a pending issue between both parties." (Emphasis supplied.) These letters show clearly that Zawada was aware, as late as June 1952, that the adjustment of tonnage rates or the equalization of the rates for tallymen were only "proposed" matters which were under "negotiation." "Negotiation is a process of submission and consideration of offers until an acceptable offer is made, and accepted". United States v. John McShain, Inc., 1958, 103 U.S.App.D.C. 328, 258 F.2d 422, 424.

On July 21, 1952, Loehr reported to Zawada that the Railroad had advised, "Since this facility was abandoned effective with the close of business, June 29, 1942 [sic], before any agreement concerning the tonnage rates of pay at Philadelphia Transfer was reached, further negotiation would serve no useful purpose, and we are, therefore, closing our files." The System Board Executive Committee directed Loehr to seek the advice of the office of the Grand President. Loehr conferred with both Kinley and Crawford of the Grand President's staff, who thought the matter should be dropped. In their opinion the Railroad had a right to close Philadelphia Transfer and since the tonnage agreement affected primarily that location and the 52nd Street Station, and was tied in with the equalization of pay proposal, the question was moot.

In the meantime, Zawada filed claims for those affected by the closing because he believed that the Railroad had no right to abandon Philadelphia Transfer and that the tonnage agreement was still in effect. Many of the men formerly employed at that location "followed the work" to other divisions, and Zawada was directed to cease pursuing claims

for these men who were now under the jurisdiction of other division chairmen. Although Zawada contacted the other division chairmen, the claims were not pursued. Thus, only the men under Zawada's control continued to agitate in connection with these pay matters.

In January 1954, four of the unions under Zawada's control held a mass meeting of some 900 men. Tonnage and other grievances were discussed. G. R. Kershaw, Senior Vice General Chairman and next in authority to Loehr, and a member of the System Board of Adjustment, advised the meeting that the Railroad would not agree to the changes because they considered them too costly. The four lodges decided that the Brotherhood was not processing their grievances satisfactorily and voted to cease paying "per capita taxes" to the Grand Lodge and System Board. Whereupon, their charters were revoked, and the revocation was upheld by the Pennsylvania Supreme Court in its decision of February 6, 1956.

The standards by which the duty of fair representation are to be measured are set forth in the opinion of Judge McLaughlin in the second Gainey case—Gainey v. Brotherhood of Railway & Steamship Clerks, 313 F.2d 318, supra:

" * * * [A] union which possesses the power to act for all employees of a bargaining unit has the corresponding duty to represent all the members of the unit fairly, impartially and in good faith, without 'hostile discrimination' against any of them. * * * In order to come within its ambit, the complaint * * * must have more than conclusory statements alleging discrimination. In particular plaintiffs must make a showing that the action or in-

action of the statutory representative complained of was motivated by bad faith, for the gravamen of the rule is 'hostile discrimination.' * * * [T]hat certain conduct of the Brotherhood or a condition permitted to exist by it is 'invidious' and 'discriminatory', without a concomitant identification of lack of good faith, will not set forth a claim * * *."

The rate differential between the Eastern and Central Regions did not constitute hostile discrimination. About 15% of the tallymen were making tonnage and had no complaint. For a time the rates in the Central Region were generally higher. When they became higher and by how much is not clear. There is evidence that in 1941 tonnage was eliminated in the Central Region in favor of monthly salaries. The proposal to the Railroad in 1949, which had the approval of Zawada and the Local Committee, was to eliminate irregularities between tallymen and loaders and truckers in the Eastern Region and not to apply Central Region rates. Moreover, at about this time, in 1949 or 1950, there is a question, as far as this record is concerned, whether there was much of a difference, if any, between Central and Eastern rates. The uncontradicted testimony is the Railroad also wanted tonnage eliminated. Alexander, Loehr and Zawada so testified. There was an allegation in the complaint that the tonnage agreement proved costly to the Railroad. Zawada was questioned on how it could be costly without at the same time being favorable to the plaintiffs. Both his and Alexander's testimony indicate plaintiffs might have made more money under tonnage in the later years than under Central Region rates.[3] Tallymen may have wanted

3. "Q [The Court] May I interrupt you? I don't quite understand this. It has been admitted in this case, I think, that the railroad wanted the tonnage agreement abrogated.

A [Zawada] Yes.

\* \* \* \* \* \* \*

Q They wanted it changed. Now, you have said in your complaint, and I repeat again, that the tonnage agreement proved

costly. I just want to know how was the tonnage agreement costly to the railroad.

A About that time, the inception of the mechanical devices known as chore boys—they are mechanical platform devices where instead of a 2-wheeled hand truck, the trucker would have at least two in the gang and you would load your freight on this mechanical device and drive it instead of pulling, and with the

a monthly salary even if it did not amount to more money because of the fringe benefits. But even Zawada was willing to forego this if he could not get it for the truckers and loaders as well. In his April 19, 1950, letter to Loehr, he said:

"A further understanding in connection with the paid holidays—it is clearly understood that if the tallymen are to receive payment for holidays, the miscellaneous employees will also be entitled to same. If you are unable to obtain this, then we are better off allowing the matter to remain status quo as far as the holiday situation is concerned."

This may be an additional explanation for Zawada's suggestion to Loehr on September 14, 1948, that he submit a counter proposal to extend tonnage to other stations in the Philadelphia Division.

tonnage rates being in force, even as they were with these mechanical devices, the railroad was of the opinion that it would run them more money, because they were using mechanical devices to expedite the handling of the freight, and at the same time paying tonnage rates, and they felt that if they eliminated tonnage in its entirety, they could use these mechanical devices, chore boys they call them, and handle the freight. They were of the opinion, and tests were made, and they brought in these chore boys, and they were putting them two in a gang, in some of the gangs.

Q This statement that the tonnage agreement proved costly to the railroad means only one thing to me, unless it is explained. It must have meant that they were paying more money to the tallymen.

A They were paying more money to the tallymen, and they would be paying more money to the loaders and truckers and the men that made the tonnage.

Q Then is the reason for that statement that the tonnage agreement proved more costly because they paid more money to the loaders and truckers and not to the tallymen? I don't know whether I make myself clear, but I want to know the answer to this question: How did the tonnage agreement prove costly to the railroad insofar as the tallymen are concerned?

A The only answer I could give you is what I outlined, with the exception of those chore boys, that they woud have to— more gangs would maintain tonnage, and the carrier had to pay for the purchase of the equipment, the maintenance of the equipment, and then the earnings would be greater, and they felt by the elimination of tonnage they would save that money. Therefore, the tonnage agreement, with the inception of these mechanical devices, would prove more costly to them, and that is why they wanted to abrogate the tonnage agreement.

Q Did the railroad think that it would prove more costly because they would have to pay more money to the tallymen?

A Well, they would have to pay more on a tonnage basis, if they made more tonnage.

Q Weren't the tallymen better off then with the tonnage agreement than with the so-called equalization agreement?

A No. The tallymen in most instances would rather be placed on a monthly rate because here you would have a guaranteed monthly rate to get that money in.

Q All right. I understand. That would be the reason they would want it.

A That's right.

Q I am now talking about the difference in money here. In your opinion, if this tonnage agreement had continued, we will say the Philadelphia Terminal station was still in existence, because of these new mechanical devices, would not the tallymen have been making more money than they were making in the Central Division under the salary arrangement, even though maybe that was not as desirable, for other reasons which you have just mentioned?

A They would be making more money, though with the use of the mechanical device, they would be making more money. Whether they would make more than the monthly rate, that I couldn't tell you because that would be on a monthly basis. They would get that guarantee, but I would assume that there would be more days that they would make tonnage by the use of the equipment and thereby increasing their capacity.

\* \* \* \* \*

Q [Brotherhood's Counsel] What did you do after that proposal was made?

A [Alexander] \* \* \* and I think we lost all interest in the matter at that time because the big saving in tonnage rates would have been at Philadelphia Transfer, if we were to get any at all. So we just dropped it, and that was the end of it." '

Plaintiffs insist that Loehr's letter of April 21, 1950,[4] to Nancarrow constitutes a contract, although this was rejected by the Court of Appeals in the opinion written by the late Judge Goodrich in the first Gainey appeal:

"There is an additional reason why plaintiffs' basic claim against the Railroad must fall. That cause of action is based solely on a contract. According to the complaint, that contract is embodied in a letter written by the General Chairman of the Brotherhood's Pennsylvania Railroad System Board of Adjustments to W. L. Nancarrow, General Manager of the Railroad's eastern region, under date of April 21, 1950. * * *

* * * * * *

"We think no amount of discovery, deposition or other procedural device can make this letter into a contract. The district judge described it as 'a mere offer or, possibly, a counter offer,' 177 F.Supp. at page 428. We are sure it is no more than that and would be inclined to say it is simply an invitation for further comment from the Railroad official to whom it is addressed. It is perfectly clear that an interpretation of a writing is for the court. An examination of this writing reveals plainly that it is not an acceptance under general principles of contract law or under the decisions of Pennsylvania courts in which state this letter was composed, mailed and received. We reiterate that no amount of discovery can turn a letter which on its face is not a contract into one." (Footnotes omitted.)

Even if this letter and the surrounding circumstances did spell out a contract, plaintiffs misconceive the effect of a failure to enforce. The issue is bad faith, not a mistake in judgment and not negligence. Failure to enforce, without more, would not constitute liability. Likewise, it is uncontradicted that in negotiating after the Section 6 notice was served and after Philadelphia Transfer was closed, Loehr acted on the advice of his superiors and counsel. The failure to seek an injunction or other relief provided by the Railway Labor Act, under the circumstances, is not hostile discrimination. Gainey v. Brotherhood of Railway & Steamship Clerks, 313 F.2d 318, 324, supra. Vaca v. Sipes, 1967, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842, was a suit against the union for breach of a duty of fair representation in handling a grievance. Plaintiff had been discharged because of poor health, a fact which plaintiff disputed. The union processed the grievance through several steps, but then became convinced the medical evidence did not support plain-

---

4. "Dear Sir:
 This refers to your letter of April 7, 1950 which is in connection with our letter of January 21, 1949 filing formal notice in accordance with the procedures of the Railway Labor Act and our initial meeting held on February 15, 1949 with respect to our desire to abrogate the Agreement of July 24, 1941 with respect to tonnage rates of pay applicable to certain positions at the Philadelphia Transfer, Philadelphia Terminal Division, and to substitute in lieu thereof a new Agreement to be effective as of March 1, 1949.
 We quote from your letter:
 'We have given very careful consideration to your proposal in this matter; and, in view of the pronounced decrease in the total amount of tonnage handled, and because of the changed present day conditions, at the Philadelphia Transfer, we are of the opinion that it would be of mutual benefit to both Management and the Employes if the tonnage rates were eliminated entirely at this location.'
 In accordance with our discussion at our meeting in Philadelphia, Pa., on April 19, 1950, we are agreeable to your suggestion. This is based on our understanding that the rate of pay for Tallymen in the Eastern Region will be changed to the same rate of pay that is in effect in the Central Region, that is $269.17 a month, and further, that the same considerations attendant to such monthly-rated employes in the Central Region will be granted these employes. We suggest that this entire arrangement be made effective as of May 1, 1950.
 Will you please advise if you concur.
 Yours truly,
 s/S. V. W. Loehr
 General Chairman"

tiff and declined to proceed to arbitration. In reversing a verdict for the plaintiff, the Supreme Court said at page 189 and 192, 87 S.Ct. at pages 916 and 918:

"Quite obviously, the question which the Missouri Supreme Court thought dispositive of the issue of liability was whether the evidence supported Owens' assertion that he had been wrongfully discharged by Swift, regardless of the Union's good faith in reaching a contrary conclusion. This was also the major concern of the plaintiff at trial: the bulk of Owens' evidence was directed at whether he was medically fit at the time of discharge and whether he had performed heavy work after that discharge.

\* \* \* \* \* \*

"For these same reasons, the standard applied here by the Missouri Supreme Court cannot be sustained. For if a union's decision that a particular grievance lacks sufficient merit to justify arbitration would constitute a breach of the duty of fair representation because a judge or jury later found the grievance meritorious, the union's incentive to settle such grievances short of arbitration would be seriously reduced. The dampening effect on the entire grievance procedure of this reduction of the union's freedom to settle claims in good faith would surely be substantial. Since the union's statutory duty of fair representation protects the individual employee from arbitrary abuses of the settlement device by providing him with recourse against both employer (in a § 301 suit) and union, this severe limitation on the power to settle grievances is neither necessary nor desir-

able. Therefore, we conclude that the Supreme Court of Missouri erred in upholding the verdict in this case solely on the ground that the evidence supported Owens' claim that he had been wrongfully discharged."

Plaintiffs introduced other evidence to show a pattern of discrimination.

■ *National Wage Increases*:[5] There were national wage increases in 1937, 1941 and 1944. The increases were in cents per hour and presented difficulties when applied to a tonnage agreement. The 1941 and 1944 increases were handled by Loehr and the General Superintendent and were eventually paid. There is a dispute whether the 1937 increase was paid. Loehr was in the Central Region at the time and it was paid there, and he assumed it was paid in the Eastern Region. Zawada testified it was not paid, but admitted that in the counterclaim filed in the charter revocation proceedings, item (b) listed failure of the Brotherhood to process claims for the 1941 and 1944 increases but not for the 1937 increase. He said this was an oversight on his part. Plaintiffs called six retired tallymen, in addition to Zawada, as witnesses. One, Smith, testified that he had filed a claim for $1,700 for retroactive pay. He answered one question: "Well, I expect I did at the time, but I can't remember just now because my memory is awful poor. I can't hardly remember the way home." Another, Slocum, said he did not know if he was owed retroactive pay. The others, including Young, a plaintiff, were not asked the question. Plaintiffs suggest no reason for non-enforcement of the increase except the general charge of discrimination. Payment of the 1941 and 1944 increases is not consistent with non-pay-

5. "MR. OLMSTED: Objection. Even the amended complaint does not refer to the 1937 increase. It only refers to the 1941 and the two later ones. \* \* \*
MR. RICHETTE: Are you finished, sir?
MR. OLMSTED: Yes. I object to any evidence concerning 1937 on that additional ground.

MR. RICHETTE: Your Honor, my burden is to prove discrimination, and the basis for the claims for failure to incorporate increases in tonnage go back to 1937, and that is all the reason I am offering it, not as an issue, Your Honor.
THE COURT: Overruled."
In his reply brief plaintiffs' counsel argued that the 1937 increase was a principal issue.

ment of the 1937 increase, which came before there was any agitation over tallymen's wages and long before the union shop. Plaintiffs have not met their burden of proof. There is insufficient evidence to find that the 1937 increase was not paid. *The Butler Street Agreement:* After the Philadelphia Transfer was closed, the Railroad built a new freight station on Butler Street, Philadelphia. The Universal Carloading Company transferred its freight business there from stations of the Reading Railroad. This created seniority problems with employees of the Pennsylvania Railroad, Reading Railroad and Universal Carloading Company, all demanding seniority, which obviously could not be attained. An agreement was negotiated between the Brotherhood and the three employers under which the seniority of all employees was dovetailed. Plaintiffs were so enraged they called the mass meeting of January 28, 1954. While both Loehr and Zawada naturally wanted to secure an agreement favorable to the employees under their jurisdiction, so did the respective Brotherhood officials of Reading and Universal Carloading employees. The Brotherhood owed a duty of fair representation to all three. If either the demand of Zawada, interested only in Philadelphia Terminal Division employees, or Loehr, interested only in employees of Pennsylvania, was met, a large number of Reading and Universal Carloading employees would have been frozen out. As stated by the Supreme Court of the United States in Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048:

> "The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
>
> "Compromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary."

*Award 4291:* This was the case of 58 women employed at Philadelphia Transfer whose jobs were discontinued and the work given to a private contractor. Loehr processed the claims successfully from Zawada's level to the National Railroad Adjustment Board, Third Division, which in 1949 gave claimants an award. The Railroad refused to pay so an action to force payment was started by Grand President Harrison and Loehr in the United States District Court for the Western District of Pennsylvania. The case never came to trial because it was compromised by private counsel engaged by the claimants who were dissatisfied with the delay. Pretrial motions had been filed and there was a serious backlog in the Western District. There is no proof that the Brotherhood attempted to delay the trial.

*Award 4292:* This is a companion case to No. 4291. The Railroad employed a private contractor to do the work of tallymen, truckers and loaders. Again, Loehr processed the claims from Zawada's level to the National Railroad Adjustment Board, Third Division, and obtained an award. The persons entitled to recover and the amounts were to be determined by the Brotherhood and the Railroad. The task was difficult because payroll records of the private contractor were unavailable. They could not reach an

agreement. Loehr testified that although he requested the necessary information, Zawada never gave it to him. In his reply to the findings of the two Vice Presidents Zawada explained that meetings were arranged with the financial secretary of each lodge, with the local chairman of each lodge, and after the claimants were ascertained, the names were forwarded to the local committees for each claimant to certify to the time lost. There was much correspondence between Loehr and Zawada since the task was time consuming. Finally, a joint committee was appointed to determine whether the claimants submitted could be "considered available under provisions of the decision rendered by the Third Division." After nine months the joint committee submitted separate reports. The claimants again obtained private counsel who brought suit against the Railroad and the Brotherhood. The suit was compromised by the Railroad. The delay in collection cannot be attributed to the Brotherhood.

There is not a shred of evidence that the decision in 1952 not to invoke the National Railway Labor Act had any connection with the union shop agreement. The only eviednce was given by Loehr who testified there was no connection. Neither is there any evidence that the Brotherhood, by its action or non-action, was motivated to punish plaintiffs for their opposition to the Brotherhood and its officers.

■ The 1941 tonnage agreement, the action of the Brotherhood with respect to the April 18, 1950, proposal and the April 21, 1950, letter of Loehr to Nancarrow, the Section 6 notice, and the closing of Philadelphia Transfer, singly or together, did not constitute hostile discrimination.

Cunningham v. Erie R. Co., 2 Cir. 1966, 358 F.2d 640, relied on by plaintiffs, is not on point. The district court had found that the union was annoyed by plaintiff's seniority claims and that although the policy of the union was not to proceed against a member for non-payment of dues until he had been delinquent for three months, the union proceeded against the plaintiff when he had only been delinquent for two months. Also, the union had been very liberal with other members in accepting payment of dues when the arrearages were more than three months; in fact, there were cases where the arrearages were more than six months. The Court of Appeals upheld the district court's findings that plaintiff's discharge was for reasons "other than the failure of the employee to tender the periodic dues * * * uniformly required as a condition of acquiring or retaining membership".

■ The Brotherhood has raised the statute of limitations as a defense. The Pennsylvania six-year statute of limitations applies. Falsetti v. Local 2026, UMW, D.C., 249 F.Supp. 970, aff'd 3 Cir. 1966, 355 F.2d 658. See also International Union, UAW v. Hoosier Cardinal Corp., 1966, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192. 12 P.S. § 31. The Brotherhood contends the statute started to run (a) as to Central Region rates on April 21, 1950, or at the latest on October 10, 1950, when the Railroad rejected the proposal, and (b) as to the abolition of tonnage on June 29, 1952, when Philadelphia Transfer was closed or at the latest on July 21, 1952, when the Railroad served notice it was closing its files. Plaintiffs contend that the duty of fair representation continued until the first action was brought in 1959, and it was only then that the right of action accrued. Plaintiffs cite Falsetti v. Local 2026, UMW, supra.

Plaintiffs' construction of Falsetti is erroneous. On January 8, 1954, Falsetti was furloughed and his job given to an employee with less seniority. In August 1956, he sued the union in the state court alleging a breach of the duty of fair representation in not processing his grievance. He was unsuccessful. In November 1963, he brought an action in two counts in federal court; the first alleged a breach of the duty of fair representation; the second, brought under Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, alleged

a conspiracy between the union and employer in violation of the collective bargaining agreement. The district court found that the Section 301 claim accrued in January 1954, when plaintiff was furloughed, and that the breach of the duty of fair representation accrued *sometime between* January 1954 and August 1956. The Court of Appeals affirmed. Neither the district court nor the Court of Appeals indicated that the count based on breach of the duty of fair representation accrued on the filing of the state court action; rather, it accrued "sometime between" the date of the discharge and the date of the state court action. The district court specifically rejected any theory of a continuing cause of action:

" \* \* \* While the evidence is such that it is more difficult to pinpoint the date that his cause of action for the Union's alleged breach of its duty of fair representation accrued, this had to be by August 6, 1956, when he commenced the state court action and asserted such a breach in his complaint filed therein. The evidence does not substantiate plaintiff's contention that the defendants assumed any *continuing* obligations, duties or relationship toward the plaintiff after that date (and certainly not after September 11, 1956, when he was notified of his expulsion from the defendant Union). We do not believe that a plaintiff has a perpetual right to sue for violation of a fiduciary duty on the theory that, once undertaken, the fiduciary's duty and the fiduciary relationship last evermore—particularly when the suit is an action at law for damages. See: Sherwin v. Oil City National Bank, 229 F.2d 835 (3d Cir. 1956). In short, we are convinced that the statute of limitations has run on plaintiff's claims." (Footnote omitted.)

In affirming, the Court of Appeals stated:

" \* \* \* As an alternative to the latter proposition appellant submitted that the breach of the appellees' obligations, as charged, was of a continuing nature and so within the limitations period. \* \* \*

"The District Court's rejection of appellant's contention that the state statute of limitations was tolled by the commencement of the state suit is amply supported by the law; so with appellant's continuing cause of action theory. \* \* \* " (Footnotes omitted.)[6]

The reason for the "sometime between" holding in Falsetti is clear. When a member is aggrieved by a discharge, he has a right to expect that the union will represent him fairly in processing his grievance. Ordinarily, at the date of his discharge, he would have no reason to believe that the union would fail in its duty. There comes a time, however, when he determines, or should determine, that he is not being represented fairly. It is at that time that the cause of action accrues. Falsetti, by filing the state action, charged that he was not being represented fairly and thus he established the latest date at which the cause of action could accrue. Since that date was more than six years before the institution of the federal action, it was unnecessary for the court to determine whether the action had accrued at an earlier time. In the language of Judge Freedman in Daniels v. Beryllium, E.D.Pa.1964, 227 F.Supp. 591, "the statute of limitations did not begin to run until plaintiffs, by the exercise of reasonable diligence, could have discovered \* \* \* the \* \* \* condition was caused by [defendant] \* \* \*." Cf. Tobacco & Allied Stocks, Inc. v. Transamerica Corp., 3 Cir. 1957, 244 F.2d 902.

When did plaintiffs know, or when should they have known, they were not being represented fairly? Com-

6. One case, Brotherhood of Locomotive Firemen v. Mitchell, 5 Cir. 1951, 190 F. 2d 308, appears to hold that the duty undertaken by a union is a continuing one and limitation does not run against it. This case cites no authority, and has never been cited for this proposition. It is contrary to what has been said above and will not be followed.

plaints against tonnage started in 1942 and continued until Philadelphia Transfer was closed. If there was a violation of the duty of fair representation, plaintiffs were apprised of it long before the events leading up to the mass meeting in January 1954, and the revocation of the charters. It is not necessary to detail the evidence to pinpoint the exact date because it is clear that at the very latest plaintiffs knew or should have known of any violation when the order of the Supreme Court of Pennsylvania upholding the revocation of the charters was handed down on February 6, 1956, more than six years prior to the filing of the present action.[7] In the counterclaim filed in that action, sworn to by Zawada, defendants alleged: the " * * * illegal, improper and harmful actions and derelict failure to act of the Brotherhood, its agents and appointees, including S. V. W. Loehr, General Chairman, George M. Harrison, Grand President, and L. B. Snedden, Grand Vice President," in failing, among other things, to obtain wage rates for tallymen comparable with tallymen in the Central Region, to effectuate Award 4292 and Award 4291, and to process and demand payment of the 1944 wage increase. In the same pleading defendants alleged that the revocation of the charters "was in violation of natural justice, that such action was arbitrary and capricious and that the real purpose and attempt of the Brotherhood and of its national officers, servants and agents is to punish Joseph P. Zawada for his loyal, aggressive and vigorous representation over a period of 12 years as Division Chairman, of the membership of the defendant lodges and all other local lodges on the Philadelphia Terminal Division * * *." There is no indication that the Brotherhood assumed any obligation after the revocations, and as the court found in Falsetti, "we do not believe that a plaintiff has a perpetual right to sue for violation of a fiduciary duty on the theory that, once undertaken, the fiduciary's duty and the fiduciary relationship last evermore * * *."

■ A few additional matters deserve mention. This action is primarily one at law for damages for the breach of the duty of fair representation and conspiracy although certain equitable relief by way of a mandatory injunction is also requested. To the extent that laches controls, rather than the statute of limitations, equitable relief is also barred. In Russell v. Todd, 1940, 309 U.S. 280,

7. In their brief plaintiffs state:
 "All the exhibits reveal agitation for change in the Tonnage agreement commenced in the early World War II years." * * *
 "Before the union shop agreement of 1952, the Grand President was made acutely aware of the fact that members of the Philadelphia locals were in an uproar over the negligence of Mr. Loehr in the handling of the tonnage negotiations among other things." * * *
 "This [The Butler Street Agreement— January 21, 1954] was the fuse which blew the powder keg." * * *
 "Thus with the aid of the Supreme Court of Pennsylvania, Grand President Harrison achieved the supreme result: the Pennsylvania Railroad was rid, once and for all of the 'persistent and vocal demands' of Zawada and his Protective Committeemen. Moreover, the carrier was rid of Zawada who filed between 225 and 300 claims per month against them for contract violations. * * * And the union was free finally (after being harassed from 1941 to 1956) of Zawada and his group's demands that the upper echelons of this union do something with respect to tonnage and equalization of pay.
 "Revocation of the charters of the locals and expulsion and/or suspension of the leaders of the revolt brought silence on the Eastern Region after fifteen years of correspondence, conferences, charges and counter-charges of dereliction of duty.
 "The full circle of discrimination was completed. Not only were the demands for negotiation of an equalization of rates for Tallymen aborted, but the people and their leaders lost their political strength within the union to do anything about it: their charters and hence their votes were destroyed; and their leaders lost their positions within the union. Peace reigned once more on the Pennsylvania Railroad. 'The persistent and vocal complaints' of Thompson v. Brotherhood (supra) were silenced but for this lawsuit."

at page 289, 60 S.Ct. 527, at page 532, 84 L.Ed. 754, the Court said:

"Even though there is no state statute applicable to similar equitable demands, when the jurisdiction of the federal court is concurrent with that of law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations. * * * "

Moreover, even when an action is deemed solely one in equity, while a statute of limitations is not controlling, it is drawn upon for the light it may shed on whether a plaintiff has inexcusably slept on his rights so as to make a decree against a defendant unfair. Cf. Holmberg v. Armbrecht, 1946, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743.

Thus, whether the present action is in equity, or is one for equitable relief in aid of a legal right, the action is barred. As stated by the Court of Appeals in Falsetti v. Local 2026, UMW, supra, "If laches had been the basis for [the district court's] dismissal, the record's reflection of appellant's extensive delay would also have supported such a ruling."

The first action filed in 1959, and the second filed in 1960 did not toll the statute insofar as the claim of breach of duty of fair representation is concerned. During the pendency of these actions the period of limitation continued to run, and after it had expired no new action could be maintained in the absence of a savings provision. Counsel have cited no statute and the orders of dismissal contain no provision which permitted the filing of a new action after the dismissal even though the period of limitations had run. Cf. Di Sabatino v. Mertz, M.D.Pa.1949, 82 F.Supp. 248; Falsetti v. Local 2026, UMW, supra.

■ Plaintiffs argue that during negotiations Alexander made a counter-proposal to equalize Eastern Region rates with Central Region rates, which, under Brotherhood of Locomotive Firemen v. Mitchell, 5 Cir. 1951, 190 F.2d 308, represented discrimination prohibited by the Railway Labor Act because the counter-proposal would have eliminated discrimination and was not accepted by the Brotherhood, and since the fact of the counter-proposal was unknown to plaintiffs until Alexander's testimony, the bar of the statute of limitations and laches is lifted, citing Pennsylvania Co. for Ins. v. Ninth Bank & Trust Co., 1932, 306 Pa. 148, 155, 158 A. 251. It is not necessary to discuss these principles because Alexander did not make a counter-proposal which would have eliminated discrimination. He could not remember if he offered more money than tallymen would have earned under the existing agreement, although some would have recieved more and some less. He refused to say he had offered rates prevalent in the Central Region.[8]

8. Cross-examination by Mr. Richette:

"Q So that now we have that you offered him three rates prevalent in the Central Region, but that you at the same time also wanted to eliminate all of the other rates but three in the Central Region?

A (Mr. Alexander) That's right, three rates in the Central Region. Whether they were the then prevailing rates or not, I will not say. There were three rates that I proposed. Now, how I arrived at them, I don't recall that.

* * * * * * *

Q Now, what I am trying to get at, Mr. Alexander, is this: You said you certainly knew in dealing with labor that they are not about to give up anything they had already earned, they had worked hard to get that 1941 agreement, apparently, which gave them incentive pay, and you didn't want to give, according to your testimony, you didn't want to give Mr. Loehr the $269.17 paid out in Pittsburgh, but you said you were ready to give them in lieu of the tonnage the three prevalent rates in the Central Region.

Now, I want to ask you—

A I wish you would stop paraphrasing my testimony.

THE COURT: Yes. That is not the testimony Mr. Richette.

MR. RICHETTE: He wanted to give them three rates.

THE COURT: That is different.

MR. RICHETTE: On the Eastern Region—

THE COURT: That is different than three prevalent rates. Go ahead.

The other defenses need not be considered.[9]

Judgment will be entered in favor of the Brotherhood and against plaintiffs.

MR. RICHETTE: Three of the seven, shall we say, of the seven or eight—

THE COURT: That is still not his testimony.

BY MR. RICHETTE:

Q How many rates were in existence in Pittsburgh?

A I said about nine, as near as I can recall.

Q All right. Three of those nine you wanted to give him.

A Not necessarily. I said three rates.

Q Three rates.

A Which could have been rates that I grabbed out of the air and figured out for my own purposes. It could have been entirely different from any of the existing rates, if I thought that was a good round-figure rates."

9. The Brotherhood did not defend on Rule 41(b), "Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue or for lack of an indispensable party, operates as an adjudication upon the merits." (Amended in 1966 to delete "lack of an indispensable party" and substitute the phrase "failure to join a party under Rule 19".) See American Nat. Bank & Trust Co. v. United States, 79 U.S.App.D.C. 62, 1944, 142 F.2d 571; Bartsch v. Chamberlin Co. of America, 6 Cir. 1959, 266 F.2d 357.