## BROTHERHOOD OF RAILROAD TRAINMEN ET AL. *v.* CHICAGO RIVER & INDIANA RAILROAD CO. ET AL.

No. 313.   Argued February 26, 1957.—Decided March 25, 1957.

*William C. Wines* argued the cause for petitioners. With him on the brief was *John J. Naughton.*

*Walter J. Cummings, Jr.* argued the cause for respondents. With him on the brief were *Kenneth F. Burgess, Marvin A. Jersild* and *Wayne M. Hoffman.*

*Clarence E. Weisell* and *Harold N. McLaughlin* filed a brief for the Brotherhood of Locomotive Engineers, as *amicus curiae,* urging reversal.

*Clarence M. Mulholland, Edward J. Hickey, Jr.* and *Richard R. Lyman* filed a brief for the Railway Labor Executives' Association, as *amicus curiae,* supporting petitioners.

*John H. Morse* and *William J. Hickey* filed a brief for the American Short Line Railroad Association, as *amicus curiae,* urging affirmance.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

We are asked to interpret that provision of the Railway Labor Act [1] which created the National Railroad Adjustment Board for the resolution of minor grievances in the event that the parties were unable to settle them by negotiation. The ultimate question is whether a railway labor organization can resort to a strike over matters pending before the Adjustment Board.[2]

---

[1] 44 Stat. 577, as amended, 45 U. S. C. §§ 151–188.

[2] The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the Railway Labor Act are

The Chicago River and Indiana Railroad Company operates the switching and yard facilities at the Chicago stockyards. A segment of the employees of the River Road were represented by the Brotherhood of Railroad Trainmen. A collective bargaining agreement between the Brotherhood and the River Road was in existence throughout the period covered by this case. The present disagreement arises from an accumulation of twenty-one grievances of members of the Brotherhood against the carrier. Nineteen of these were claims for additional compensation, one was a claim for reinstatement to a higher position, and one was for reinstatement in the employ of the carrier. When negotiations failed, the Brotherhood called a strike. Because of the serious nature of the impending work stoppage, the National Mediation Board proffered its services. The mediator was unsuccessful, and upon his withdrawal, the River Road submitted the controversy to the Adjustment Board. The Brotherhood promptly issued a strike call for four days later.

The River Road then sought relief from a District Court. Because of the threatened irreparable injury to the carrier, its employees and the 600 industries and 27 railroads served by it, the complaint prayed for a preliminary injunction, and ultimately a permanent injunction, against a strike by the Brotherhood over the grievances pending before the Adjustment Board. A temporary restraining order was issued, but that order was vacated and the complaint dismissed upon the finding by the district judge that the Norris-LaGuardia Act was applicable and that the court lacked jurisdiction to grant the relief requested. The Court of Appeals for the Seventh Circuit reversed. 229 F. 2d 926. A permanent injunc-

---

not the same as those which form the basis of the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* It is one of those differences which underlies the controversy in this case.

tion was accordingly entered by the District Court and affirmed by the Seventh Circuit. We granted certiorari in order to resolve an important question concerning interpretation and application of the Railway Labor Act.[3] 352 U. S. 865.

The grievances for which redress is sought by the Brotherhood are admittedly "minor disputes" as that phrase is known in the parlance of the Railway Labor Act. These are controversies over the meaning of an existing collective bargaining agreement in a particular fact situation, generally involving only one employee. § 2, Sixth.[4] They may be contrasted with "major disputes" which result when there is disagreement in the bargaining process for a new contract. § 2, Seventh.[5] See *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 722–724.

The first step toward settlement of either kind of dispute is negotiation and conference between the parties. Section 3, First (i),[6] provides that—

> "The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes . . . ."

---

[3] In addition to the importance of the question, there was a conflict in the decisions of the Courts of Appeals. *Brotherhood of Railroad Trainmen* v. *Central of Georgia R. Co.,* 229 F. 2d 901, decided by the Fifth Circuit, came to a conclusion contrary to that of the Seventh Circuit in this case. Certiorari had been granted in both cases, 352 U. S. 865, but we dismissed the writ in the *Central of Georgia* controversy upon a suggestion of mootness. 352 U. S. 995.

[4] 45 U. S. C. § 152, Sixth.

[5] 45 U. S. C. § 152, Seventh.

[6] 45 U. S. C. § 153, First (i).

If the parties are unable to reach an agreement, the section continues—

". . . but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the [National Railroad] Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

Section 3, First (m),[7] declares that—

"The awards of the several divisions of the Adjustment Board . . . shall be final and binding upon both parties to the dispute . . . ."

This language is unequivocal. Congress has set up a tribunal to handle minor disputes which have not been resolved by the parties themselves. Awards of this Board are "final and binding upon both parties." And either side may submit the dispute to the Board. The Brotherhood suggests that we read the Act to mean only that an Adjustment Board has been organized and that the parties are free to make use of its procedures if they wish to; but that there is no compulsion on either side to allow the Board to settle a dispute if an alternative remedy, such as resort to economic duress, seems more desirable.[8] Such an interpretation would render meaningless those provisions in the Act which allow *one* side to submit a dispute to the Board, whose decision shall be final and binding on *both* sides. If the Brotherhood is

---

[7] 45 U. S. C. § 153, First (m).

[8] The Brotherhood does not discuss this interpretation in the event that the union had referred the dispute to the Adjustment Board, as is normally the case in grievance disputes, and the carrier was recalcitrant. It is to be doubted that the Brotherhood would support allowing carriers the same right to defeat the jurisdiction of the Adjustment Board that it claims for itself. The statutory language, however, would support no distinction.

correct, the Adjustment Board could act only if the union and the carrier were amenable to its doing so. The language of § 3, First, reads otherwise and should be literally applied in the absence of a clear showing of a contrary or qualified intention of Congress.

Legislative history of the provisions creating the National Railroad Adjustment Board reinforces the literal interpretation of the Act. The present law is a composite of two major pieces of legislation. Most of the basic framework was adopted in 1926.[9] In 1934, after eight years of experience, the statute was amended, and in that amendment the Adjustment Board was born.[10]

The distinction between "major disputes" and "minor disputes" was found in the 1926 statute. Above the level of negotiation and conference, each was to follow a separate procedure. Section 3, First,[11] of that Act called upon carriers or groups of carriers and their employees to agree to the formation of boards of adjustment, composed equally of representatives of labor and management, to resolve the "minor disputes." If this step were unsuccessful, these disputes along with the "major disputes" became a function of the Board of Mediation, predecessor of the National Mediation Board.

The obvious lack of any compulsion toward a settlement of disputes was a basic characteristic of the Act and proved to be a major weakness in the procedures for handling "minor disputes." As stated in the Report of the House of Representatives Committee on Interstate and Foreign Commerce, after hearings on the 1934 amendment: "In many instances . . . the carriers and the employees have been unable to reach agreements to establish such boards [of adjustment]." H. R. Rep. No. 1944, 73d Cong., 2d Sess. 3. This was not the only weak-

[9] 44 Stat. 577.
[10] 48 Stat. 1185.
[11] 44 Stat. 578–579.

ness, however. "Many thousands of these [minor] disputes have been considered by boards established under the Railway Labor Act; but the boards have been unable to reach a majority decision, and so the proceedings have been deadlocked." *Ibid.*

This condition was in marked contrast to the declared purpose of the 1926 Act ". . . to settle all disputes, whether arising out of the application of . . . agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." § 2, First.[12] The Report continued:

"These unadjusted disputes have become so numerous that on several occasions the employees have resorted to the issuance of strike ballots and threatened to interrupt interstate commerce in order to secure an adjustment. This has made it necessary for the President of the United States to intervene and establish an emergency board to investigate the controversies. This condition should be corrected in the interest of industrial peace and of uninterrupted transportation service." *Ibid.*

The means chosen to correct this situation are the present provisions of § 3, First, concerning the National Railroad Adjustment Board. The Board was set up by Congress, making it unnecessary for the parties to agree to establish their own boards.[13] In case of a deadlock on the Adjustment Board, which continued the policy of equal representation of labor and management, the appro-

---

[12] 44 Stat. 577–578.

[13] Section 2, Second, authorizes carriers or groups of carriers and their employees to agree to the establishment of system, group or regional boards of adjustment similar to those in the 1926 Act. These boards can have jurisdiction co-extensive with that of the National Board, but the existence of the latter insures against accumulation of disputes through ineffectiveness of the local boards.

priate division is allowed to select a neutral referee to sit with them and break the tie. If the division cannot agree even on a referee, the Act provides that one shall be appointed by the National Mediation Board.[14] Thus was the machinery built for the disposition of minor grievances.

The change was made with the full concurrence of the national railway labor organizations. Commissioner Joseph B. Eastman, Federal Coordinator of Transportation and principal draftsman of the 1934 bill, complimented the unions on conceding the right to strike over "minor disputes" in favor of the procedures of the Adjustment Board:

> "The willingness of the employees to agree to such a provision is, in my judgment, a very important concession and one of which full advantage should be taken in the public interest. I regard it as, perhaps, the most important part of the bill."[15]

Asked if the Act made it a matter of discretion whether disputes would be submitted to the Adjustment Board, he replied in the negative. It was, he said, a matter of duty—

> ". . . and it is my understanding that the employees in the case of these minor grievances—and that is all

---

[14] "Minor disputes" were eliminated from the functions of the Mediation Board by the 1934 amendment. However, that Board can still become involved in a "minor dispute" case if "any labor emergency is found by it to exist at any time." § 5, First, 45 U. S. C. § 155, First. Such was the fact in this case when the threatened strike presented an emergency situation. The Mediation Board enters these cases solely on its own motion, however. It cannot be called into the dispute by either or both of the parties or by an employee or group of employees as is true for disputes not within the jurisdiction of the Adjustment Board.

[15] Hearings before House of Representatives Committee on Interstate and Foreign Commerce on H. R. 7650, 73d Cong., 2d Sess. 47.

38

that can be dealt with by the adjustment board—are entirely agreeable to those provisions of the law.

"I think that is a very important concession on their part. . . . [T]his law is in effect an agreement on the part of the parties to arbitrate all of these minor disputes." [16]

The chief spokesman for the railway labor organizations was George M. Harrison. He appeared as chairman of the legislative committee of the Railway Labor Executives' Association before both the House of Representatives and the Senate Committees. This Association comprised the twenty-one standard railway labor groups, including the Brotherhood of Railroad Trainmen. He testified before the House Committee:

"So, out of all of that experience and recognizing the character of the services given to the people of this country by our industry and how essential it is to the welfare of the country, these organizations have come to the conclusion that in respect to these minor-grievance cases that grow out of the interpretation and/or application of the contracts already made that they can very well permit those disputes to be decided, . . . by an adjustment board." [17]

Later, before the Senate Committee, he declared:

"Grievances are instituted against railroad officers' actions, and we are willing to take our chances with this national board because we believe, out of our experience, that the national board is the best and most efficient method of getting a determination of these many controversies that arise on these railroads between the officers and the employees.

. . . . .

[16] *Id.*, at 58, 60.
[17] *Id.*, at 81–82.

"These railway labor organizations have always op-
posed compulsory determination of their controver-
sies. . . . [W]e are now ready to concede that we
can risk having our grievances go to a board and get
them determined, and that is a contribution that
these organizations are willing to make." [18]

The voice of labor was not unanimous in this conces-
sion. The representative of the International Brother-
hood of Teamsters vehemently objected to the adoption
of § 3, First.

"We are unalterably opposed to paragraph M, . . .
[which] brings about compulsory arbitration and
prevents the use of the only weapon in the hands of
organized labor. We believe that a very dangerous
precedent would be established with the passage of
this paragraph, and to the best of our knowledge it
is the first time that any such measure has been
enacted by the Congress of the United States." [19]

This record is convincing that there was general under-
standing between both the supporters and the opponents
of the 1934 amendment that the provisions dealing with
the Adjustment Board were to be considered as com-
pulsory arbitration in this limited field. Our reading of
the Act is therefore confirmed, not rebutted, by the
legislative history.

The only question which remains is whether the federal
courts can compel compliance with the provisions of the
Act to the extent of enjoining a union from striking to
defeat the jurisdiction of the Adjustment Board. The
Brotherhood contends that the Norris-LaGuardia Act [20]

---

[18] Hearings before Senate Committee on Interstate Commerce on
S. 3266, 73d Cong., 2d Sess. 33, 35.
[19] Hearings before House of Representatives Committee, *supra,*
note 15, at 118.
[20] 47 Stat. 70, as amended, 29 U. S. C. §§ 101–115.

has withdrawn the power of federal courts to issue injunctions in labor disputes. That limitation, it is urged, applies with full force to all railway labor disputes as well as labor controversies in other industries.

We hold that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable.

In adopting the Railway Labor Act, Congress endeavored to bring about stable relationships between labor and management in this most important national industry. It found from the experience between 1926 and 1934 that the failure of voluntary machinery to resolve a large number of minor disputes called for a strengthening of the Act to provide an effective agency, in which both sides participated, for the final adjustment of such controversies. Accumulation of these disputes had resulted in the aggregate being serious enough to threaten disruption of transportation. Hence, with the full consent of the brotherhoods, the 1934 amendment became law.

The Norris-LaGuardia Act, on the other hand, was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining. The Act aimed to correct existing abuses of the injunctive remedy in labor disputes. Federal courts had been drawn into the field under the guise either of enforcing federal statutes, principally the Sherman Act, or through diversity of citizenship jurisdiction. In the latter cases, the courts employed principles of federal law frequently at variance with the concepts of labor law in the States where they sat. Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital. Rep. LaGuardia, during the

floor debates on the 1932 Act, recognized that the machinery of the Railway Labor Act channeled these economic forces, in matters dealing with railway labor, into special processes intended to compromise them.[21] Such controversies, therefore, are not the same as those in which the injunction strips labor of its primary weapon without substituting any reasonable alternative.[22]

In prior cases involving railway labor disputes, this Court has authorized the use of injunctive relief to vindicate the processes of the Railway Labor Act. *Virginian R. Co.* v. *System Federation No. 40,* 300 U. S. 515, was an action by the union to enjoin compliance with the Act's provisions for certification of a bargaining representative. The question raised was whether a federal court could issue an injunction in a labor dispute. The Court held:

> "It suffices to say that the Norris-LaGuardia Act can affect the present decree only so far as its provisions are found not to conflict with those of § 2, Ninth, of the Railway Labor Act, authorizing the relief which has been granted. Such provisions cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act." *Id.,* at 563.

In *Brotherhood of Railroad Trainmen* v. *Howard,* 343 U. S. 768, and other similar cases,[23] the Court held that

---

[21] 75 Cong. Rec. 5499, 5503–5504.

[22] The Adjustment Board cannot entertain a case on its own motion. Its processes must be invoked by one or both of the parties. In this case, the River Road filed the grievances with the Board before seeking an injunction. Cf. the exhaustion of remedies provision in § 8 of the Norris-LaGuardia Act. 29 U. S. C. § 108.

[23] *Graham* v. *Brotherhood of L. F. & E.,* 338 U. S. 232; *Tunstall* v. *Brotherhood of L. F. & E.,* 323 U. S. 210; *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192. See also *Rolfes* v. *Dwellingham,* 198 F. 2d. 591.

the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act.

"Our conclusion is that the District Court has jurisdiction and power to issue necessary injunctive orders [to enforce compliance with the requirements of the Railway Labor Act] notwithstanding the provisions of the Norris-LaGuardia Act." *Id.*, at 774.

This is a clear situation for the application of that principle.[24]

The Brotherhood has cited several cases in which it has been held that the Norris-LaGuardia Act's ban on federal injunctions is not lifted because the conduct of the union is unlawful under some other statute.[25] We believe that these are inapposite to this case. None involved the need to accommodate two statutes, when both were adopted as a part of a pattern of labor legislation.

The judgment of the Court of Appeals must be affirmed.

*It is so ordered.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

---

[24] The Norris-LaGuardia Act has been held to prevent the issuance of an injunction in a railway labor case involving a "major dispute." *Brotherhood of Railroad Trainmen* v. *Toledo, P. & W. R. Co.,* 321 U. S. 50. In such a case, of course, the Railway Labor Act does not provide a process for a final decision like that of the Adjustment Board in a "minor dispute" case.

[25] *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.,* 311 U. S. 91; *East Texas Motor Freight Lines* v. *International Brotherhood of Teamsters,* 163 F. 2d 10; cf. *W. L. Mead, Inc.,* v. *International Brotherhood of Teamsters,* 217 F. 2d 6; *In re Third Avenue Transit Corp.,* 192 F. 2d 971; *Carter* v. *Herrin Motor Freight Lines, Inc.,* 131 F. 2d 557; *Wilson & Co.* v. *Birl,* 105 F. 2d 948.