Moses RUFFIN, Individually and on be-
half of others similarly affected

v.

BROTHERHOOD OF RAILWAY AND
STEAMSHIP CLERKS, FREIGHT
HANDLERS AND STATION EM-
PLOYEES, PRR SYSTEM BOARD.

Civ. A. No. 42761.

United States District Court,
E. D. Pennsylvania.

June 23, 1970.

Lawrence J. Richette, Philadelphia,
Pa., for plaintiffs.

Allen S. Olmsted 2nd, Joseph Neff
Ewing, Jr., of Saul, Ewing, Remick &
Saul, Philadelphia, Pa., for defendant.

OPINION

HIGGINBOTHAM, District Judge.

I.

INTRODUCTION

After twenty years this railway labor
dispute has truly come to the end of the

line. For reasons to be elaborated below I shall grant defendant's amended motion to dismiss.

On May 18, 1967, plaintiff filed a class action on behalf of some six hundred tallymen (freight handlers and checkers), seeking a mandatory injunction to compel the defendant union to create a Special Adjustment Board pursuant to the Railway Labor Act 45 U.S.C.A. § 153 Second (Supp.1969). It was plaintiffs' intention to present to the Board wage claims arising from a contract allegedly entered into by the then Pennsylvania Railroad and the defendant union in April of 1950.

The defendant moved to dismiss plaintiffs' suit or in the alternative to stay the action pending disposition of a related action, Gainey v. Brotherhood of Railway and Steamship Clerks, etc., and the Pennsylvania Railroad, 275 F.Supp. 292 (E.D.Pa.). Briefs were filed and argument was held on May 29, 1967. Thereafter, on June 19, 1967, I issued an Order staying the disposition of the issues raised in the instant case pending the resolution of the so-called third Gainey case.

Chief Judge Sheridan issued his opinion in Gainey on September 5, 1967. See 275 F.Supp. 292. On February 6, 1969, the defendant Brotherhood filed an amended motion to dismiss, but argument was only held on April 28th of this year. The delay was in part occasioned by an application for Writ of Certiorari to the United States Supreme Court in Gainey which was denied. See 394 U.S. 998, 89 S.Ct. 1590, 22 L.Ed.2d 775 (1969). Then I was urged by plaintiffs to await decision of Antonioli v. Lehigh Coal and Navigation Company, 47 F.R.D. 198 (E.D.Pa., 1969), a case having "the same issue which is before you in the subject action." (See docket entries 16–25.)

## II.

### WHY PLAINTIFFS' ACTION MUST BE DISMISSED

By their Complaint, plaintiffs could hope to survive a motion to dismiss by prevailing at any one of several stops along the road to a plaintiffs' verdict. But all such stops have long been foreclosed.

### A. *The Alleged Contract of April 18, 1950.*

At the very heart of plaintiffs' complaint, paragraph 6 alleges:

"On April 18, 1950, the Pennsylvania Railroad offered and the defendant union accepted a new contract as to wages for tallymen. The terms of the agreement were that tallymen in the Eastern Region of the Pennsylvania Railroad would receive the same wages as tallymen were then earning in the Central Region of the carrier."

Subsequent paragraphs of the complaint spell out the alleged consideration for the new wage agreement, the alleged refusal by the carrier to put the new contract into effect, and the alleged refusal of the union to do its duty under the Railway Labor Act, i. e., to take action to enforce the contract. Thereafter, the Complaint continues, the aggrieved tallymen made several attempts to secure the rewards of the alleged contract. Plaintiffs first instituted the three Gainey law suits. And now by the instant suit they seek to compel the defendant union to establish a Special Adjustment Board under 45 U.S.C.A., § 153 Second, there to resolve "what plaintiff believes to be a wage claim on his behalf and all of some 600 tallymen in the class for which he now sues * * *. [T]he carrier owes to each and every tallyman on the Eastern Region the difference in the wages he has received since [April 18, 1950] and the wages he would have earned had the carrier lived up to the negotiated agreement with the union." (Paragraph 20 of Complaint.)

If persistence could make a contract then plaintiffs would long ago have prevailed, for this is no less than the fourth law suit in which they have sought to establish the existence of a wage contract

circa April 1950 between the Pennsylvania Railroad and the defendant union.

In 1959, in the first *Gainey* case, Gainey v. Brotherhood of Railway and Steamship Clerks, etc., 177 F.Supp. 421 (E.D.Pa.1959), District Judge, now Chief Judge Lord ruled that the letter said to establish the contract [1] "reveals itself as a mere offer or, possibly, a counter offer." (at p. 428), Chief Judge Lord further stated:

> "The final sentence [of the letter], which clearly asks whether the offer is acceptable, is deemed controlling as to the absence of prior agreement, i. e. 'Will you please advise if you concur.' "

> It seems patent that the requirements for the formation of an informal, bilateral contract were not met by the showing made on the complaint and exhibit, and it is so ruled. * * * The letter is found to fit the definition of an offer—a manifestation of intent." (at p. 429.)

Looking at the contract claim on appeal, Circuit Court Judge Goodrich, in affirming the District Court's dismissal of the complaint, stated:

> "There is an additional reason why plaintiffs' basic claim against the Railroad must fall. That cause of action is based solely on a contract, * * * embodied in a letter written by [S. V. W. Loehr] to W. L. Nancarrow * *.
>
> * * * * * *
>
> "We think no amount of discovery, deposition or other procedural device can make this letter into a contract. The district judge described it as 'a mere offer or, possibly, a counter offer,' * * * We are sure it is no more than that and would be inclined to say it is simply an invitation for further comment from the Railroad official to whom it is addressed." Gainey v. Brotherhood of Railway & Steamship Clerks, 275 F.2d 342, at 344, 345. (CCA 3, 1960).

Writing for the United States Court of Appeals in the second *Gainey* appeal, Circuit Judge McLaughlin spoke of "an alleged 'equalization of pay agreement' which * * * had never been consummated." Gainey v. Brotherhood of Railway & Steamship Clerks, Etc., 313 F.2d 318 (1963) at 320. And in the third and last *Gainey* case, Gainey v. Brotherhood of Railway and Steamship Clerks, Etc., 275 F.Supp. 292 (E.D.Pa., 1967), affirmed 406 F.2d 744 (CCA 3, 1968), cert. denied 394 U.S. 998, 89 S.Ct. 1590, 22 L.Ed.2d 775 (1969) a case tried on the merits, Chief Judge Sheridan found "[t]hat there was neither an offer or

---

1. The letter from the General Chairman of the Brotherhood, S. V. W. Loehr, to the General Manager of the Eastern Region of the Pennsylvania Railroad, W. L. Nancarrow, reads as follows:

Dear Sir:

This refers to your letter of April 7, 1950, which is in connection with our letter of January 21, 1949, filing formal notice in accordance with the procedures of the Railway Labor Act and our initial meeting held on February 15, 1949, with respect to our desire to abrogate the Agreement of July 24, 1941, with respect to tonnage rates of pay applicable to certain positions at the Philadelphia Transfer, Philadelphia Terminal Division, and to substitute in lieu thereof a new Agreement to be effective as of March 1, 1949:

We quote from your letter:

"We have given very careful consideration to your proposal in this matter; and, in view of the pronounced decrease in the total amount of tonnage handled, and because of changed present day conditions, at the Philadelphia Transfer, we are of the opinion that it would be of mutual benefit to both Management and the Employes if the tonnage rates were eliminated entirely at this location."

In accordance with our discussion at our meeting in Philadelphia, Pa., on April 18, 1950, we are agreeable to your suggestion. This is based on our understanding that the rate of pay for Tallymen in the Eastern Region will be changed to the same rate of pay that is in effect in the Central Region, that is $269.17 a month. And further, that the same considerations attendant to such monthly-rated employes in the Central Region will be granted these employes. We suggest that this entire arrangement be made effective as of May 1, 1950.

Will you please advise if you concur.

Yours truly

**1368**

binding agreement * * *" and included in his opinion generous quotations from the late Circuit Judge Goodrich in the first *Gainey* appeal. See above.

■ There is then no dearth of precedent for the proposition that *no* equalization of pay agreement was entered into by the Pennsylvania Railroad and the defendant Union in April of 1950.

Plaintiffs have had not one, but many days in Court and, because of the principle of collateral estoppel, they are precluded from relitigating the contract issue here. Thus paragraph 6 of the Complaint fails.

The purpose of collateral estoppel "is to preclude the repeated controversy of matters judicially determined * * * to save individuals and courts from the waste and burden of relitigating old issues." 1 B Moore's Federal Practice ¶ 0.441[2], p. 3779 (1965). Professor Moore states the doctrine thusly:

"Where there is a second action between parties, or their privies, who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended." 1 B Moore's, supra, p. 3777.

With plaintiffs' assertion (in a memorandum of law filed prior to argument on April 28, 1970) that "The same class is present here as in *Gainey*." all the elements necessary for collateral estoppel are operative, and plaintiffs' contract claim fails. And with the pay equalization contract definitively out of the suit I come to the question: What wage claims could plaintiffs present to the Special Adjustment Board they seek to create?

**B.** *The Termination of the Tonnage Agreement and Defendant Union's Alleged Unlawful Refusal to Process Plaintiffs' Grievance.*

Although only two paragraphs of thirty-nine in plaintiffs' complaint refer to "tonnage payments," nevertheless counsel for plaintiffs now states that "the prime issue to be resolved by the Special Board of Adjustment is whether or not the plaintiffs were deprived of earnings under the tonnage agreement when the carrier unilaterally terminated that agreement in June of 1952 * * * at the Philadelphia Transfer." (Plaintiffs' memorandum of law, pp. 2 and 3.) Paragraphs 8 and 11 of the Complaint deal with the union's alleged "failure to process the plaintiffs' grievance with respect to wage losses resulting from the termination of the 'tonnage agreement'." (According to plaintiffs' memorandum of law, p. 3) Paragraph 8 reads as follows:

"After the carrier and union defendant consummated the aforesaid agreement to pay tallymen in the Eastern Region the same monthly salaries as being paid to Central Region tallymen, [this is the alleged contract of April 18, 1950, which by the principle of collateral estoppel is out of the suit] the carrier terminated the 'tonnage' payments in the Philadelphia Region."

And paragraph 11 states:

"The Grand Lodge of the union, over which Mr. Harrison, aforesaid ruled, refused to invoke mediation either to resolve a wage dispute or to resolve wage claims."

Does the defendant union have a duty under the Railway Labor Act to process plaintiffs' "tonnage payment" grievance? and more specifically to create a Special Adjustment Board to deal with it? Plaintiffs allege that defendant union is guilty of "invidious discrimination" and "is acting in bad faith in refusing * * * the establishment of this Special Adjustment Board." (See paragraphs 27 and 29 of the Complaint.)

The charge of bad faith and invidious discrimination, like the contract claim discussed above, carries us with a feeling of deja vu through well-travelled landscape. In the second *Gainey* appeal, Circuit Judge McLaughlin set forth the union's duty of fair representation:

"The Steele rule [from Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) and its progeny] is that a union which possesses the power to act for all employees of a bargaining unit has the corresponding duty to represent all the members of the unit fairly, impartially and in good faith, without 'hostile discrimination' against any of them. Although originally employed in racial discrimination problems arising under the Railway Labor Act, the protection afforded by this doctrine has since been extended to encompass all forms of hostile discrimination. (Citations omitted.)

"In order to come within its ambit, the complaint before us must have more than conclusory statements alleging discrimination. In particular plaintiffs must make a showing that the action or inaction of the statutory representative complained of was motivated by bad faith, for the gravamen of the rule is 'hostile discrimination.' An allegation that certain conduct of the Brotherhood or a condition permitted to exist by it is 'invidious' and 'discriminatory', without a concomitant identification of lack of good faith will not set forth a claim sufficient to call for the use of the Steele doctrine. (Citations omitted.) 313 F.2d 318, 322, 323.

Judge McLaughlin concluded that "[t]he Brotherhood's bad faith, hostile discrimination * * * is at most illusory." (p. 323.) On a further point, Judge McLaughlin noted:

"Plaintiffs say that the Brotherhood 'discriminated' against them because it did not seek an injunction to enjoin the Railroad from terminating the 'tonnage' agreement in alleged violation of the Act. This bare accusation without more is not the showing of improper motive or purposeful discrimination that exists in all the cases applying the Steele doctrine. * * * The common thread running throughout these opinions is the improper, usually bad faith, motivation for the course taken. That essential element is not present in the complaint or its collateral papers. Plaintiffs have no cause of action without it." (313 F.2d 318, 324.)

In the third *Gainey* case, Chief Judge Sheridan addressed the issue as follows:

"The issue is bad faith, not a mistake in judgment and not negligence * * it is uncontradicted that in negotiating after * * * Philadelphia Transfer was closed, Loehr acted on the advice of his superiors and counsel. The failure to seek an injunction or other relief provided by the Railway Labor Act, under the circumstances, is not hostile discrimination." (275 F.Supp. 292, 303.)

And Judge Sheridan concluded that "[t]he 1941 tonnage agreement, the action of the Brotherhood with respect to the April 18, 1950, proposal and the April 21, 1950, letter * * *, the Section 6 notice, and the closing of Philadelphia Transfer, singly or together, *did not constitute hostile discrimination.*" (Emphasis added, at p. 306.)

In affirming Judge Sheridan, the United States Court of Appeals for the Third Circuit stated:

"The district court found, *inter alia,* that the Brotherhood did not act in bad faith and was not guilty of 'hostile discrimination' in failing to obtain Central Region rates of pay for Eastern Region tallymen, or in failing to seek injunctive or other relief provided by the Railway Labor Act under the circumstances of the closing of the Philadelphia Transfer Freight Station. Having found an absence of hostile discrimination in the Brotherhood's dealings with and representation of the appellants, the district

court quite properly refused to hold that the Brotherhood breached its duty of fair representation." (406 F.2d 744, 745.)

■ The charge of bad faith and invidious discrimination must fall before the conclusions of Judge Sheridan and the Court of Appeals for the Third Circuit. They have found that defendant union did not act in bad faith and was not guilty of hostile discrimination, and the issue will not be relitigated here. This Court cannot and will not compel a union to process a grievance by creating a Special Adjustment Board when it has been finally adjudicated that the union—in the exercise of its duty of fair representation and in good faith—believes the grievance to be lacking in merit. Vaca v. Sipes, 386 U.S. 171, 188–195, 87 S.Ct. 903, 916–919, 17 L.Ed.2d 842 (1967).

C. *Plaintiffs' Legal Authorities Do Not Change The Result.*

In May of 1969, counsel for plaintiffs wrote to the Court as follows: (Docket entry 19):

"There is pending before Hon. Joseph S. Lord, III, in Antonioli v. Lehigh & New England R.R., et al., [47 F.R.D. 198], C.A. No. 68–2444, the same issue which is before you in [Ruffin]: whether or not a United States District Court may under the 1966 amendment to the Railway Labor Act compel a union to establish a special adjustment board under the Act for the purpose of presenting a grievance involving a wage claim against a railroad."

In Antonioli v. Lehigh Coal & Navigation Co., 47 F.R.D. 198 (1969) the relief sought was a Court Order directing the defendant carriers to invoke a special adjustment board pursuant to 45 U.S.C.A. § 153 Second. The question arose whether the plaintiff (representing two classes of railroad workers) had standing to invoke § 153 Second. Judge Lord found defendants' position that "a special board of adjustment is not available to individual employees absent a union's concurrence in their desire to invoke one" to be supported both by the language of the section and the Senate Report of the 1966 amendments. Judge Lord concluded that "[s]ince plaintiff is not such an 'employee representative' within the meaning of section 153 Second, he is not a proper person to seek the convening of a special board. Accordingly, he does not have standing to seek affirmative relief from this court." 47 F.R.D. 198, 201. Defendant's motion to dismiss was granted.

At oral argument, counsel for plaintiff cited to the Court Walker v. Southern Railway Company, 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966) and Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) and stated: "These are the decisions upon which I now depend * * * I stand on *Walker*."

The question in *Walker* is whether Moore v. Illinois Central Railroad Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941) and progeny should be overruled in light of Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). The Supreme Court held in *Walker* "that we should not overrule those decisions [*Moore* and progeny] in [*Walker's*] case." 385 U.S. 196 at 199, 87 S.Ct. 365 at 367.

Under *Moore*, a discharged railroad employee aggrieved by the discharge could either pursue administrative procedures established by the applicable collective bargaining agreement subject to the Railway Labor Act *or* if he accepted his discharge as final, he could bring an action at law for damages in an appropriate state court. *Maddox* dealt with the question whether contract grievance procedures might be put to one side in favor of a lawsuit in a labor situation subject to the Labor Management Relations Act of 1947. The Supreme Court "held that contract grievance procedures voluntarily incorporated by the parties in collective bargaining agreements subject to the LMRA, unless specified by the parties to be nonexclusive, must be exhausted before direct legal redress may be sought

by the employee." (Quoted from discussion in *Walker*, 385 U.S. at 197, 198, 87 S.Ct. at 366).

At the District Court level, *Walker* won a judgment for damages, and the Court of Appeals for the Fourth Circuit reversed, holding that *Maddox* required the petitioner first to exhaust his administrative remedies. The Supreme Court reversed the judgment of the Court of Appeals and remanded. The *Moore* case option of administrative remedies *or* an action at law was saved for the time.

Plaintiff misconstrues the import of *Walker* when he quotes to this Court the following language: "Provision for arbitration of a discharge grievance, a minor dispute, is not a matter of voluntary agreement under the Railway Labor Act; *the Act compels the parties to arbitrate minor disputes before the National Railroad Adjustment Board established under the Act.*" Walker v. Southern Railway Company, 385 U.S. 196 at 198, 87 S.Ct. 365 at 366. (Emphasis added.)

What the Supreme Court is saying is: arbitration *vel non* is not a matter to be decided upon during contract negotiations. Arbitration is given whatever may be embodied in the collective bargaining agreement. *"The Act compels the parties to arbitrate minor disputes before the National Railroad Adjustment Board established under the Act."*

Plaintiff would have us read the italicized sentence above to mean: whenever in the judgment of an individual employee—but not in the judgment of the employee representative, the union— there exists a minor dispute, then the matter in dispute must go before the National Railroad Adjustment Board *or* a Special Adjustment Board. Counsel for plaintiff would have us confuse the difference between the National Railroad Adjustment Board which the *Walker* Court was talking about and a Special Adjustment Board which the Court was *not* talking about.

Several points must be understood. The plaintiffs themselves could have brought their matter before the National Railroad Adjustment Board. On this there is no dispute. But by the *Antonioli* decision, as we saw, p. 1370 above, plaintiffs are not the proper persons to seek to convene a Special Adjustment Board.

Now, facing the heart of plaintiffs' thrust, *if* we can read the italicized sentence above to relate to a Special Adjustment Board, we must understand it to mean: The Act compels the union and the carrier to arbitrate a minor dispute if the union and/or the carrier believes there is merit to the minor dispute before the National Railroad Adjustment Board or a Special Adjustment Board. If neither the union nor the carrier finds merit in the grievance, the individual employee can, of course, take the matter to the National Railroad Adjustment Board. This is his right. But it also follows that if, as here, the union in good faith does not find merit in the employee grievance, it need not call for the creation of a Special Adjustment Board. This is our case.

A look at Brotherhood of Railroad Trainmen v. Chicago, R. & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), also relied on by plaintiff, reinforces our decision that no injunction should issue to compel the defendant union to move to create a Special Adjustment Board. *Railroad Trainmen,* which interprets that provision of the Railway Labor Act which created the National Railroad Adjustment Board, addressed the question "whether a railway labor organization can resort to a strike over matters pending before the Adjustment Board." and decided in the negative. The Supreme Court firmly rebutted the notion that the Railway Labor Act was to be read "to mean only that an Adjustment Board had been organized and that the parties are free to make use of its procedures if they wish to; but that there is no compulsion

# 1372

on either side to allow the Board to settle a dispute if an alternative remedy, such as resort to economic duress, seems more desirable." (p. 637.) The Supreme Court concluded that "the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field." (Minor disputes.) (p. 640.)

The case does not advance plaintiffs' argument. There is, of course, no mention of a Special Adjustment Board in an opinion handed down nine years prior to the legislation that created such boards. My discussion of *Walker* holds good for *Railroad Trainmen*. Again I conclude that if a union in good faith does not believe in the merits of a dispute with the carrier, the union need not go to arbitration before the National Railroad Arbitration Board. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

■ If zeal and determination by counsel were the sole criteria for an adjudication, certainly plaintiffs might have won this case by now. At various times plaintiffs' counsel described the fate which has befallen plaintiffs as a "monstrous injustice," and it is evident that he feels deeply about this case. But the rule of collateral estoppel is designed to bring an end to litigation—regardless as to whether a subsequent Judge would have decided the case on the merits in the same way as did the prior Judge. Accordingly, I shall apply the salutory principle of collateral estoppel without comment as to my views on the original merits of the case. Cf. Clemens v. Central Railroad Company of New Jersey, 399 F.2d 825 (CCA 3, 1968).

Because I find plaintiffs' wage claims —arising from the alleged contract of April 1950 and from the termination of the tonnage agreement—to have been conclusively determined against plaintiffs and because I find plaintiffs are not the proper parties to seek the convening of a Special Board of Adjustment and lack standing to seek such affirmative relief here—I shall GRANT de-

fendants' amended motion to dismiss. On the view I take of the case, it is not necessary to discuss defendant's points about laches and the statute of limitations.