AMERICAN AIRLINES, INC., Plaintiff,

v.

TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO ("TWU"); William G. Lindner, Individually and as International President of TWU; Ernest M. Mitchell, Individually and as International Vice President and Director, Air Transport Division of TWU; Herman J. Leonard, Individually and as International Vice President and Assistant Director, Air Transport Division of TWU; Roosevelt Watts, Individually and as International Secretary-Treasurer of TWU; Local 501, TWU, AFL–CIO ("Local 501") and Patrick J. McGahan, Individually and as President of Local 501; Local 502, TWU, AFL–CIO ("Local 502") and Howard W. Blaydes, Individually and as President of Local 502; Local 505, TWU, AFL–CIO ("Local 505") and Norman Allshouse, Individually and as President of Local 505; Local 507, TWU, AFL–CIO ("Local 507") and John D. Fortune, Individually and as President of Local 507; Local 510, TWU, AFL–CIO ("Local 510") and Richard Dawson, Individually and as President of Local 510; Local 512, TWU, AFL–CIO ("Local 512") and Clarence Edwards, Individually and as President of Local 512; Local 513, TWU, AFL–CIO ("Local 513") and James Jackson, Individually and as President of Local 513; Local 514, TWU, AFL–CIO ("Local 514") and Robert J. Ridge, Individually and as President of Local 514; Local 519, TWU, AFL–CIO ("Local 519") and Frank Palumbo, Individually and as President of Local 519; Local 521, TWU, AFL–CIO ("Local 521") and John Perdue, Individually and as President of Local 521; Local 527, TWU, AFL–CIO ("Local 527") and Celeste P. Conroy, Individually and as President of Local 527; Local 540, TWU, AFL–CIO ("Local 540") and E. F. Downey, Individually and as President of Local 540; Local 541, TWU, AFL–CIO ("Local 541") and Trent W. Barber, Individually and as President of Local 541; and each of said individuals as representatives of a class consisting of all of plaintiff's employees represented by TWU for purposes of collective bargaining under the Railway Labor Act, Defendants.

No. CV–80–0101.

United States District Court,
E. D. New York.

Jan. 15, 1980.

**250**

Poletti Freidin Prashker, Feldman & Gartner by Eric Rosenfeld, New York City, for plaintiff.

O'Donnell & Schwartz by Asher W. Schwartz, New York City, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiff, American Airlines ("American"), seeks a preliminary injunction enjoining defendants, the Transport Workers Union of America ("TWU"), their officers, agents and employees "from in any manner or by any means, directing, calling, causing, authorizing, inducing, instigating, conducting, continuing, engaging or threatening any strike, picketing or other concerted slowdown or work stoppage, picketing or concerted refusal to report for work or to accept or perform work assignments or any other work stoppage . . . ." American initiated the action by filing a complaint and an order to show cause which contained a temporary restraining order and was signed by Judge Edward R. Neaher at 10:20 p. m. on the 15th of January. Over 12,000 American employees are represented by the TWU.

## FACTS

The facts relating to this and a companion case, *Scott et ano. v. American Airlines Inc.*, docket number 80 C–0176, are essentially the same. One Lori Fahs, designated by the TWU as President of Local 543 of the TWU in Dallas, Texas, was issued a C–314 disciplinary notice for wearing a TWU button while working as a freight agent, in uniform, for American. Ms. Fahs was suspended for one day and was informed repetition of such behavior would lead to further disciplinary action. Evidently, Ms. Fahs was wearing the button to support TWU's organizing[1] drive among the agents to win recognition of TWU as the bargaining representative of the agents. On January 15, 1980 TWU-represented employees engaged in a system-wide work stoppage, or a so-called "sympathy-strike" in support of Ms. Fahs and Local 543's organizational efforts.[2]

American's "Uniform Regulations" provide that "unspecified variations or additions to the uniform are prohibited." It is plaintiff's position that wearing the TWU button was an unauthorized "variation or addition." Moreover, plaintiff contends the "real purpose" of the TWU work stoppage was

"(1) to pressure American into agreeing with TWU at the bargaining table[3] to recognize TWU as the representative of the presently unrepresented Agent and Clerical employees, without resort to the procedures provided by the Railway Labor Act ("RLA") for certification of collective bargaining representatives, and (2) to serve as an opening wedge in the scheduled contract negotiations with respect to changes in the rates of pay, rules, and working conditions of the employees currently represented by the TWU."

Plaintiff further asserts that the central purpose of the RLA is to prevent interruptions in commerce and the operations of

---

**1.** In the past ten years American's clerical and agent employees have participated in four National Mediation Board representation elections, none of which have succeeded.

**2.** As a result of the strike 203 flights were delayed and four flights were cancelled. American also claims a "number of passengers [were] lost that day to competitive carriers and immeasurable damage [resulted] to American's reputation as a reliable air carrier."

**3.** At the time, American and TWU were scheduled to meet February 5, 1980 for negotiations with respect to modifications in the collective bargaining agreements insofar as they govern pay, rules, and working conditions of most of the TWU-represented employees who engaged in the January 15 strike.

carriers, and that the Act prohibits work stoppages in order to avoid the statutory procedures for determining whether and by whom carrier employees wish to be represented.

In lieu of cross-motions, which defendant indicated at oral argument would be forthcoming, the companion case, *Scott v. American, supra,* was filed. The gravamen of that complaint seeks to preclude American from enforcing any rule prohibiting employees from wearing TWU buttons, pins, or insignia. Specifically, TWU avers that § 2 (Third) of the Railway Labor Act, 45 U.S.C. § 152 (Third), prohibits interference with the wearing of union insignia during organizational activity.[4]

In this action, plaintiff American sought and received, a continuation of the injunction which had been temporarily imposed by the Court, pending determination of the issues we address here.

## DISCUSSION

### I

We are met at the threshold with the issue of this Court's power to issue an injunction in a labor dispute such as this. Defendant TWU argues we are precluded from ordering injunctive relief by the authority of *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). Plaintiff American argues that *Buffalo Forge* is inapposite here, and that

the overriding policy of the RLA requires mandatory "minor dispute" resolution procedures which should first be pursued before judicial resolutions are sought.

The Taft-Hartley Act, 29 U.S.C. §§ 141–187 enacted in 1947, amended the National Labor Relations Act of 1935, 29 U.S.C. §§ 151–167 (1970 & Supp. V 1975), to provide federal district courts jurisdiction over suits arising from alleged violations of collective bargaining agreements. However, enforcing collective bargaining agreements required invocation of injunctive relief—a method prohibited by § 4 of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115. The Supreme Court held in *Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), in an attempt to reconcile the two statutes, that:

> The unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case. *Id.,* at 253, 90 S.Ct. at 1593–1594.

The Circuit Courts reached inconsistent positions[5] in applying *Boys Markets; Buf-*

---

**4.** The Act provides:

> Representatives, for the purpose of this Act shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other, and neither party shall *in any way* interfere with, influence, coerce the other in its choice of representatives. Representatives of employees for the purpose of this Act need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier. (Emphasis added).

American seeks the injunction on grounds that further strikes "(a) will violate the duty of TWU and of American's TWU-represented em-

ployees, under the Railway Labor Act, to avoid any interruption to commerce or to the operation of any carrier (RLA § 2(1)), and to exert every reasonable effort to maintain agreements, and to settle all disputes whether arising out of such agreements or otherwise, in order to avoid any interruption to commerce (RLA § 2 First) and (b) will violate TWU's duty under the RLA to refrain from striking over minor disputes—including the pending dispute over TWU's Jan. 15, 1980 violation of the no-strike provisions of the currently effective American-TWU working agreements."

**5.** The Second, Fifth and Sixth Circuits applied *Boys Markets* narrowly, refusing to grant injunctive relief unless the strike was "over" an arbitrable dispute. One observer notes this "invariably presaged denial of injunctive relief

*falo Forge Co. v. United Steelworkers of America, AFL–CIO,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) was the Supreme Court's first opportunity to clarify its position. In a 5–4 opinion, the Court held a sympathy strike could not be enjoined pending the arbitrator's interpretation of the contract's no-strike clause. Defendant TWU contends that *Buffalo Forge* is dispositive of the instant case, and that judgment must be entered on its behalf under that opinion.

In *Buffalo Forge* the employer operated three separate facilities. Production and maintenance (P&M) employees at all locations were represented by the United Steelworkers of America, AFL–CIO ("USW") and its Local Unions No. 1874 and No. 3732—or collectively "the Union." The USW was a party to two collective-bargaining agreements between the locals and the employer, both of which contained identical no-strike clauses. The agreements also contained grievance and arbitration provisions for settling disputes over interpretation and application of each contract. The USW and two other locals (not involved in the *Buffalo Forge* litigation) were certified to represent the employer's "office clerical-technical" ("O&T") employees at the same three locations. The O&T employees thereafter struck and established picket lines at all three facilities. Thereafter the P&M employees honored the picket line and went out on strike. as well. The employer sued under § 301(a) of the Labor Management Relations Act and claimed the work-stoppage was a violation of the P&M employees' no-strike clause.

The district court in *Buffalo Forge* found that P&M employees were engaged in a "sympathy strike" in support of the striking O&T employees and then held it was forbidden to issue an injunction by § 4 of Norris-

LaGuardia Act because the P&M strike was not over an "arbitrable grievance." The court held that because the stoppage did not occur over an "arbitrable grievance" the case was not within the " 'narrow' exception to the Norris-LaGuardia Act established in *Boys Markets* . . . ." 428 U.S. at 403, 96 S.Ct. at 3145. The Court of Appeals affirmed,[6] holding that enjoining the strike, one not "over a grievance which the Union has agreed to arbitrate"[7] was not permitted by the *Boys Markets* exception to the Norris-LaGuardia Act.

## II

*Buffalo Forge* and the case at bar, though involving somewhat similar work-stoppage scenarios, are distinguishable. In the first place, it is important to note that *Buffalo-Forge* involved a *bona fide* sympathy strike, while the case at bar does not. There, the O&T employees, fully represented by separate USW locals (these locals were not actually involved in the subsequent litigation) struck, after months of negotiations toward their first collective bargaining agreement. The O&T employees established picket lines which the P&M employees honored, stopping work at all three locations.

Here, in contrast, Local 543 of the TWU in Dallas did not represent the agents at the time of the strike. Because of that fact, the system-wide stoppage on January 15 by TWU represented employees cannot, in good faith, be denominated a "sympathy strike." One commentator has defined a sympathy strike as occurring when "one union honors picket lines established by another union, and stops work itself . . . The sympathy strikers' work stoppage is based solely upon their desire to support the other union." 63 Corn.L.Rev., *supra*, fn. 2

---

in the sympathy strike context." The Third, Fourth, and Eighth Circuits read the case more broadly and enjoined such sympathy strikes. See 63 Cornell L.Rev. 507 at 510–511, and cases cited therein.

**6.** On appeal the parties stipulated that "the Union had authorized and directed the P&M employees' work stoppage, that the O&T em-

ployees' strike and picket line were *bona fide*, primary and legal, and that the P&M employees' work stoppage, though ended, 'might be resumed at any time in the near future at the direction of the International Union' . . . ." 428 U.S. at 403, 96 S.Ct. at 3145–3146.

**7.** 517 F.2d 1207, 1210 (2d Cir. 1975).

at 507. Moreover, the January 15 stoppage could not have been in sympathy with the "other union" as it was the unilateral act of Ms. Fahs, and not concerted union activity that originated the chain of events which culminated in the walk-out. Indeed, if the TWU work-stoppage "sympathized" with anyone, or anything, it sympathized with TWU's, (i. e., its own) organizational effort to win representation for the unorganized agents. Such activity does not comport with the generally accepted notion of a "sympathy strike," and defendants labelling it such does not make it so. On the contrary, such activity appears to be in violation of 29 U.S.C. § 158(b)(4)(i).

### III

■ Assuming *arguendo* that such activity is not enjoinable in light of its apparent illegality, we are faced with the issue of whether or not the dispute involved here is sufficient to command injunctive relief under the Railway Labor Act ("RLA"). A minor dispute, for the purposes of the RLA, is one that "relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Elgin, J&E Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). The Supreme Court has determined that minor disputes must go [8] to the Adjustment Board,[9] and any union strike over a grievance or issue of contract interpretation properly submissible to the Adjustment Board may be enjoined by the courts. *Brotherhood of Rail. Tr. v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). *See also Trans International Airlines, Inc. v. Int'l Brotherhood of Teamsters*, —— F.2d —— (9th Cir. 1980).

In the instant case, a number of minor disputes exist. The first such dispute is whether the TWU represented employees have the right under Article 33 [10] of the working agreement to engage in a strike in support of unrepresented employees' organizational efforts (that is, in support of something other than an underlying legal primary strike as in *Buffalo Forge* ). The second such dispute is whether the strike was intended, or partially intended, to force American to "voluntarily" recognize TWU as the representative of the airline's currently unrepresented agent and clerical personnel, and if so, whether the strike was a violation of Section 2, Third [11] of the RLA.[12] Arguably, a third such dispute may be whether the purpose, or partial purpose, of the strike was to take the first step in an effort to obtain "the best contract ever negotiated in the airline industry," [13] and if so, whether the strike was a violation of Section 2, First [14] of the RLA. While this issue was not included in American's § 29(d) complaint, it was suggested at oral argument, and is perhaps an issue for the Adjustment Board.[15]

8. "This language is unequivocal. Congress has set up a tribunal to handle minor disputes which have not been resolved by the parties themselves. . . . This record is convincing that . . . the Adjustment Board [was] to be considered as compulsory arbitration in this limited field." *Chicago River, infra*, 353 U.S. 30, 34, 39, 77 S.Ct. 635, 639, 640, 1 L.Ed.2d 622.

9. As created pursuant to Section 204 of the RLA, 45 U.S.C. § 184.

10. Article 33 provides:
"It is the intent of the parties in this Agreement that the procedures set forth herein shall serve as a means of peaceable settlement of all disputes that may arise between them, and therefore . . . (2) neither the Union nor the employees shall engage in a strike, sitdown, walkout or stoppage, slowdown or curtailment of work for any reason during the life of this Agreement."

11. 45 U.S.C. § 152, Third.

12. See, for example, the testimony of TWU's Vice President, Mr. Mitchell, at the hearing held in consideration of the motion for injunctive relief.

13. Mr. Patrick J. McGahan of TWU, posted a letter on union bulletin boards stating the intention to procure "the best contract ever."

14. 45 U.S.C. § 152, First.

15. The third dispute above, and possibly the second, if it is determined that the purpose, or partial purpose, of the stoppage was to "force" recognition, may constitute a "major dispute," and therefore would require invocation of the

**254**

■ Under the rule of *Chicago River* and its progeny, these disputes should be referred to the American-TWU System Board of Adjustment for resolution; injunctive relief is available, and appropriate, to ensure the RLA's dispute resolution processes, and, indeed, the fundamental purposes of RLA, are honored. Of course, after all the steps provided by the RLA to avoid disruption of services are exhausted, the law provides for the full utilization of traditional economic weapons at the disposal of the union in labor altercations. However, that point has not yet been reached, and the purposes of the RLA are best served by referring these disputes to the Adjustment Board. Therefore, an injunction must issue.

## CONCLUSION

For the foregoing reasons an injunction must issue enjoining TWU from conducting further work stoppages or strikes of any kind until the minor dispute resolution mechanisms of the RLA are fully exhausted.

Submit order.

mediation processes the RLA provides. In such a procedural posture, this court would again be compelled to enjoin the union to protect the policies of the RLA.