902 F.2d 36
 136 L.R.R.M. (BNA) 2152
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED TRANSPORTATION UNION, Petitioner-Appellant,
v.
CSX TRANSPORTATION, INC., Respondent-Appellee.
 No. 89-3344.
 United States Court of Appeals, Sixth Circuit.
 April 26, 1990.
 
 Before KENNEDY and RALPH B. GUY, Jr., Circuit Judges, and LIVELY, Senior Circuit Judge.
 LIVELY, Senior Circuit Judge.
 
 
 1
 This is an appeal from an order of the district court vacating two awards of a Public Law Board created by agreement of the carrier, CSX Transportation, Inc. (CSX), and the United Transportation Union (UTU), pursuant to the Railway Labor Act. 45 U.S.C. Sec. 151, et seq. (the Act). CSX and UTU are parties to a collective bargaining agreement that governs rates of pay, rules and working conditions of employees who work as conductors and trainmen in the CSX system.
 
 I.
 A.
 
 2
 This dispute arose from the way in which CSX decided to control rail traffic through areas where construction work was being done adjacent to track traveled by CSX trains. In two cases, termed the Akron dispute and the Cumberland dispute, CSX chose to control rail traffic through the construction areas by utilizing "train orders" and "proceed signals." A train order is a written notice that requires an engineer to stop the train at a designated location and either proceed through after making a visual observation of the area or wait until the train receives a yellow hand signal or an oral instruction to proceed from an employee at the work site. These proceed signals by hand and oral instructions are presently given by non-UTU represented maintenance of way employees. CSX contends that it has used train orders/proceed signals since the 1960's when these procedures were first formulated.
 
 
 3
 CSX chose to rely on train orders and hand signals at the times in question in lieu of a technique known as "flagging." Flagging requires that an employee be positioned in such a way as to stop oncoming trains by signalling them to stop with a flag. Pursuant to the collective bargaining agreement flagging must be performed by UTU-represented employees.
 
 
 4
 UTU challenged CSX's decision to employ alternate techniques to flagging at both Akron and Cumberland by filing grievances claiming that the methods used amounted to flagging and that therefore the work properly belonged to UTU-represented employees. CSX denied both claims. UTU responded by seeking arbitration of the two disputes.
 
 B.
 
 5
 The parties agreed that UTU's claims should be heard by Public Law Board 3290 (the Board), which was established by agreement in 1982. The Board was created as an alternative to the National Railroad Adjustment Board pursuant to 45 U.S.C. Sec. 153 Second. The agreement creating the Board states that this body "shall not have jurisdiction of disputes growing out of requests for changes in rates of pay, rules or working conditions nor have authority to change existing agreements or establish new rules." The agreement also provides that the Board shall consist of three members--a member affiliated with UTU, a member affiliated with CSX, and a neutral member.
 
 
 6
 The Akron and Cumberland disputes were treated as companion cases by the Board. Pre-hearing submissions were filed and evidence and argument were presented at a hearing before PLB 3290 on May 9, 1985. UTU argued that the actions undertaken by CSX at both sites amounted to flagging. CSX attempted to show that it had long utilized train orders to control rail traffic in lieu of flagging.
 
 
 7
 The Board found in favor of the union in both cases. As to the Akron case the Board found that "a flagging service was both needed and essentially being performed...." The Board's primary focus in this case might arguably appear to have centered around the need for flagging. The Board concluded that it "appears to be conceded that if flag protection was necessary that train service employees represented by the Organization [UTU] should have been called for that work." The Board found for UTU on this basis. In the Cumberland dispute the Board again found that flagging was both needed and essentially being performed. This time the primary focus appears to have been on the question of whether the actions of CSX amounted to flagging. The Board found that trains in this area were being compelled to stop by train orders and then signaled through by either radio or hand signals. The Board found that this process was equivalent to flagging and thus once again held for the union. The Board's findings were issued after an Executive Session held on May 11, 1987. However, the Board dated its two decisions January 31, 1987.
 
 C.
 
 8
 CSX failed to comply with the awards issued by the Board and UTU filed suit to enforce them. CSX filed a counterclaim seeking to have the awards set aside. Both sides then filed motions for summary judgment. The district court granted CSX's motion and denied UTU's motion for summary judgment, and entered an order setting both awards aside.
 
 
 9
 CSX had claimed for the purposes of summary judgment that the Board's decision should be set aside both for failure to comply with the procedural requisites of the Railway Labor Act and for failure of the awards to conform or confine themselves to matters within the scope of the Board's jurisdiction. The court decided the case on the latter ground--the issue of the Board's conformance with the jurisdiction granted it under the relevant agreement. The court noted in a memorandum opinion that the Board does not have "jurisdiction of disputes growing out of requests for changes in rates of pay, rules, or working conditions nor have authority to change existing agreements or establish new rules." The court went on to write that the Board accordingly "is not empowered to establish new rules for flag protection of trains passing through construction sites...." Because the Board concerned itself with whether and when flagging protection is necessary it had impermissibly usurped "management's right to determine how its trains should be operated and protected." The district court vacated both awards on this basis.
 
 
 10
 On appeal UTU argues that the district court committed reversible error in vacating the awards on the ground that the Board had acted outside the scope of its jurisdiction, because "the awards are rationally explainable as a means of furthering the aims of the contract."
 
 II.
 A.
 
 11
 In providing for judicial review of Board awards Congress prescribed a very narrow scope of review. The Act directs that "[o]n such review, the findings and order of the [Board] shall be conclusive on the parties, except that the order ... may be set aside, in whole or in part, or remanded ... for failure of the [Board] to comply with the requirements of [the Act], for failure of the order to conform, or confine itself, to matters within the scope of [its] jurisdiction, or for fraud or corruption by a member of the [Board] making the order." 45 U.S.C. Sec. 153 First(q).
 
 
 12
 In Union Pacific Railroad Co. v. Sheehan, 439 U.S. 89, 93 (1978), the Supreme Court stated that it has "time and again emphasized that this statutory language means just what it says." A court may set aside a board order only upon one or more of the bases set forth in the statute. In Sheehan the court explained the underlying purpose of the Act:
 
 
 13
 In enacting this legislation, Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements. See Gunther v. San Diego & A.E.R. Co., supra; Union Pacific R. Co. v. Price, supra; Slocum v. Delaware, L. & W.R. Co., 339 U.S. 239 (1950). The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions. Union Pacific R. Co. v. Price, supra, at 611; Elgin J. & E.R. Co. v. Burley, 327 U.S. 661, 664 (1946). Congress considered it essential to keep these so-called "minor" disputes within the Adjustment Board and out of the courts. Trainmen v. Chicago, R. & I.R. Co., 353 U.S. 30, 40 (1957). The effectiveness of the Adjustment Board in fulfilling its task depends on the finality of its determinations.
 
 
 14
 Id. at 94.
 
 
 15
 In Gunther v. San Diego & Arizona E. Ry. Co., 382 U.S. 257 (1965), the district court refused to enforce an award upon finding no express or implied provisions in the collective bargaining agreement that limited in any way what the court found to be the railroad's absolute right to remove an employee from service upon certification by the railroad's doctors that the employee was physically disqualified for active service. The court of appeals affirmed. Emphasizing congressional intent that a board's decision in cases involving "minor" disputes be final, the Supreme Court reversed because of the district court's refusal to accept the board's interpretation of the contract. The Court stated:
 
 
 16
 Paying strict attention only to the bare words of the contract and invoking old common-law rules for the interpretation of private employment contracts, the District Court found nothing in the agreement restricting the railroad's right to remove its employees for physical disability upon the good-faith findings of disability by its own physicians. Certainly it cannot be said that the Board's interpretation was wholly baseless and completely without reason. We hold that the District Court and the Court of Appeals as well went beyond their province in rejecting the Adjustment Board's interpretation of this railroad collective bargaining agreement.
 
 
 17
 Id. at 261.
 
 More recently the Court has written:
 
 18
 "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts.'... [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law--the common law of a particular industry or of a particular plant.' "
 
 
 19
 Consolidated Rail v. Railway Labor Exec. Ass'n, --- U.S. ----, 109 S.Ct. 2477, 2485 (1989) (citation omitted). A board decision has the same finality as the decision of an arbitrator. Gunther, 382 U.S. at 263. This court has stated that in reviewing an arbitrator's award, a court's duty is "to ascertain whether the arbitrator's award is derived in some rational way from the collective bargaining agreement." Detroit Coil Co. v. International Ass'n of Machinists & Aerospace Workers, Etc., 594 F.2d 575, 579 (6th Cir.), cert. denied, 444 U.S. 840 (1979).
 
 B.
 
 20
 The district court found that the Board erred by failing to confine itself to matters within its jurisdiction--the second statutory ground for setting aside an award. The court reached this conclusion on its reading the decision as a determination by the Board that flagging was necessary at the two construction sites. Since the collective bargaining agreement gave CSX the exclusive authority to determine what control mechanism should be employed at construction sites, the court found that the Board had usurped the railroad's right to determine how its trains are to be operated and protected.
 
 
 21
 CSX contends that the district court clearly acted within its authority in setting these awards aside. The railroad had followed a practice for many years of using train orders to protect obstructed tracks without flagging and had controlled the movement of trains through construction sites by train orders and proceed signals without assigning a flagman to stop the train. Furthermore, the railroad points out that an operating rule (No. 707(f)) expressly permits control of such train movements by use of train orders and proceed signals by non-UTU personnel without flag protection.
 
 
 22
 CSX argues that the awards in this case "cannot be rationally deduced from the agreement," quoting Timken Co. v. Local Union No. 1123, United Steelworkers of America, 482 F.2d 1012, 1015 (6th Cir.1973), and are not "logically derived" from any provision of the agreement, paraphrasing Schneider v. Southern Railway Co, 822 F.2d 22, 24 (6th Cir.1987). In Timken, this court upheld the district court's refusal to enforce an arbitrator's award because the arbitrator refused to apply a definition contained in the collective bargaining agreement and went outside the record to find a definition that supported his decision. Thus, the arbitrator did not draw the essence of the award from the bargaining agreement.
 
 
 23
 In Schneider we affirmed the district court order enforcing a public law board's award, upon the court's finding that the board's decision "was not without foundation in reason or in fact." 822 F.2d at 25. Recognizing an "extremely limited" scope of review, we stated:
 
 
 24
 In order to set aside the Board's decision, it would be necessary to determine that the decision was "wholly baseless and without foundation and reason." (Quoting Gunther, 382 U.S. at 264).
 
 
 25
 Id. at 24.
 
 
 26
 CSX also relies on our decision in Sears, Roebuck & Co., v. Teamsters Local Union No. 243, 683 F.2d 154 (6th Cir.1982), cert. denied, 460 U.S. 1023 (1983). In Sears the district court vacated an arbitrator's award upon finding that the arbitrator had refused to apply unambiguous language in the collective bargaining agreement and had applied a "balancing test" instead. Id. at 155.
 
 
 27
 UTU argues that under the guise of a claim that the Board acted outside of its jurisdiction, CSX actually disputes the conclusive finding of the Board that the railroad's procedures at the construction sites were the equivalent of flagging. It maintains that the district court conducted a de novo review of the facts and made findings directly contrary to those of the Board. Such a procedure is not permitted, and findings of the district court that contradict those of the Board cannot be sustained.
 
 
 28
 UTU contends that the district court in the present case violated the rule that "in determining whether an arbitrator has exceeded his authority, the agreement must be broadly construed with all doubts resolved in favor of the arbitrator's award." Walsh v. Union Pacific Railroad Co., 803 F.2d 412, 414 (8th Cir.1986), cert. denied, 452 U.S. 928 (1987). The district court recognized that the Board has found that flagging was essentially being performed at the construction sites, but then stated, "[h]owever, the award read as a whole indicates that the focus was on the need for flagging as opposed to its use, and, as noted, there was no evidence that flagging was actually performed by anyone." (Italics in original). This finding, according to UTU, clearly exceeded the district court's scope of review.
 
 III.
 
 29
 We agree with UTU that the district court failed to accord the required deference to the Board's findings. The Board found that the procedures being followed were the equivalent of flagging and that flagging was essentially being performed. Rather than accepting this finding as conclusive, the district court found from reading the award as a whole that the "focus" of the Board was on the need for flagging rather than on its actual use. Such an approach to an arbitrator's award is directly contrary to the rule that it "must be broadly construed with all doubts resolved in favor of" the award.
 
 
 30
 Read indulgently, the award does not state that the Board found that there was a need for flagging at the construction sites. Rather, it can be read to state that the actions of CSX indicated that the railroad found a need for flagging and followed procedures that were the equivalent of flagging. Thus read the award did not re-write the collective bargaining agreement or impose a new rule requiring flagging through all construction sites. It merely found that under all the circumstances disclosed by the record, flagging in fact, if not in name, was being performed, and UTU employees were not being used.
 
 
 31
 We are not persuaded by CSX's arguments that it followed procedures which conformed with past practices and were provided for in its operating rules. Rule 707(f) does not provide an alternate to flagging in all circumstances and under all conditions. It states, "When conditions will not permit turning the track over to Work Force(s) ... or if the nature of the work may cause equipment to foul adjacent tracks, work by Work Force(s) may be performed under traffic without flag protection by use of a train order." This language clearly indicates that alternative procedures may be substituted for flagging only if certain conditions are met. If these conditions are not met the fact that train orders are used does not eliminate the requirement that flag protection be provided.
 
 
 32
 The Board found that in the circumstances shown by the evidence in the Cumberland and Akron cases, use of train orders pursuant to Rule 707(f) and applying Operating Rule 93 to control train movements resulted in procedures that were equivalent to, or essentially, flagging. Under different circumstances a different board might well find that use of similar orders and procedures are not the equivalent of flagging. That is a factual determination for each board to whom a dispute is submitted, and as such, it is not subject to the sort of scrutiny applied by the district court in the present case.
 
 
 33
 The Board did not exceed its jurisdiction by committing the type of errors that led to vacating the awards in Timken and Sears. On the contrary, the awards draw their essence from the agreement, are rationally explainable, and further a purpose of the agreement-preserving to UTU members the right to be used whenever flagging is employed.
 
 IV.
 
 34
 CSX makes two additional arguments. First, it complains that the Board "did not even prepare the proposed awards for 20 months and the awards were not finally issued until after an executive session was held on May 11, 1987, more than two years after the arbitral hearing closed." Second, CSX contends that the Brotherhood of Maintenance of Way Employees (BMWE) should have been notified of the proceedings before the Board because BMWE employees performed the contested work (yellow hand signals and oral proceed orders) and would be affected by any decision made by the Board.
 
 A.
 
 35
 CSX relies upon Jones v. St. Louis-San Francisco Ry. Co., 728 F.2d 257 (6th Cir.1984), in which we held that a board lost jurisdiction over a case by delaying its decision until some 14 months after completion of hearing. The agreement under which the matter was submitted to the board contained a 15-day limit for rendering awards. This court held that the 15-day provision was not jurisdictional in the absence of an explicit statement that the board would lose jurisdiction if it failed to comply with the time limit. The court determined that in the absence of such an explicit statement, " 'the authority of the arbitrator will expire after a reasonable time beyond the period originally fixed for the award has gone by.' " Id. at 265, quoting Local Union 560, International Brotherhood of Teamsters v. Anchor Motor Freight, 415 F.2d 220, 226 (3d Cir.1969). The court then held that the board in Jones had lost jurisdiction by reason of the 14-month delay, which was found to be clearly unreasonable.
 
 
 36
 It is possible for a party to waive a time requirement by failing to object to a board's delay in rendering its decision. The Jones opinion notes the rule followed by the Second Circuit that "a court should always have the discretion to uphold a late award when no objection to the delay has been made prior to the rendition of the award or there is no showing that harm was caused by the delay." Id. at 265-66, citing West Rock Lodge No. 2120 v. Geometric Tool Company, 406 F.2d 284 (2d Cir.1968). There was no waiver in Jones because, as the court found, the grievant had made repeated efforts to have the board issue its decision during the period of delay. Treating these efforts as objections to the board's delay, the court found that the delay harmed the grievant's case. Thus, the party seeking to overturn the award did not waive the 15-day requirement.
 
 
 37
 This court also considered a delayed board decision in Schneider, 822 F.2d at 22 (6th Cir.1987). In that case the parties had modified the agreement orally to substitute "within a reasonable time" for "thirty days." The court found that the railroad and the union had acquiesced in the slow pace of the board in rendering awards in 512 cases over a 13-year period. Many of these awards were made more than nine months after hearings--the time involved in Schneider's case. Under these circumstances the district court "wisely stayed its hand" and accepted the parties' evident interpretation of reasonableness. Id. at 25.
 
 
 38
 CSX made no objection to the Board's delay in rendering its decision. Thus, Jones is distinguishable. See Hill v. Norfolk and Western Ry. Co., 814 F.2d 1192, 1199 (7th Cir.1987). In adopting the rule of reasonableness in Jones, this court stated:
 
 
 39
 The determination of reasonableness must be made giving consideration to the surrounding circumstances and any element of prejudice or harm either party suffers. This rule of reasonableness developed to prohibit parties from waiting until an award is made and objecting to it on the basis of its untimeliness only after they receive an unfavorable decision.
 
 
 40
 728 F.2d at 265 (citation omitted) (italics in original).
 
 
 41
 CSX did exactly what Jones held the rule of reasonableness was designed to prevent. It voiced no objection to the Board's delay until after the Board rendered its unfavorable decision. Now it makes totally unsubstantial claims of harm by reason of the delay. Under the circumstances of this case we conclude that the Board did not lose jurisdiction over the matter by reason of its delay in rendering a decision.
 
 B.
 
 42
 The Act requires boards to give "due notice of all hearings to the employee or employees and the carrier or carriers involved in any disputes submitted to them." 45 U.S.C. Sec. 153 First (j). The court stated in Meeks v. Illinois Central Gulf Railroad, 738 F.2d 748, 751 (6th Cir.1984), quoting Allain v. Tummon, 212 F.2d 32, 35 (7th Cir.1954), "It is 'well established that an award made by the Board in the absence of due notice to the involved parties is void.' " In Meeks the board notified the union, but failed to notify the aggrieved employee. In the present case both the aggrieved employees and the union were notified of the hearing and participated. The question is whether the award is void because another union, whose members had given hand and oral proceed signals to trains controlled by train orders, was not notified.
 
 
 43
 "Involved parties" has been construed to mean parties "likely to be harmed or substantially affected by the result of the hearing." Brotherhood of Railway, Airline and Steamship Clerks v. St. Louis Southwestern Railway Co., 676 F.2d 132, 135 (5th Cir.1982). The BMWE does not fit this description. The UTU employees did not seek to replace BMWE employees. The maintenance of way workers were at the construction sites for other purposes, and their occasional "flagging" activities were incidental to their primary occupations. The UTU employees contended that they should have been assigned to the sites for flagging only, not to replace BMWE workers.
 
 
 44
 Even if the BMWE can be considered an involved party, the failure to notify that union of the proceedings did not necessarily render the awards void. The court held in Brotherhood of Railway, Airline and Steamship Clerks that failure to notify a third-party union was a procedural error that did not necessarily void the award. 676 F.2d at 136. In that case the third-party union never objected and the railroad objected only in the court review proceedings "putatively on behalf of the [other union], after making no such objection throughout the regular proceedings under the statute." Id. at 137. This court cited Brotherhood of Clerks in support of the statement in Schneider: "It is well-established that parties to an arbitration may waive procedural defects by failing to bring such issues to the arbitrator's attention in time to allow the arbitrator an opportunity to cure the defects." 822 F.2d at 24. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 36 (1952) (a procedural objection that was clearly an afterthought not permitted to undo administrative proceedings). We do not believe the absolute Meeks rule applies to void arbitration proceedings when the party not notified is neither the grievant, his union or the railroad, and a favorable award will not result in displacing other employees.
 
 
 45
 Here, neither CSX nor BMWE ever objected to the failure to notify BMWE. Since an award in favor of the UTU employees would not cause displacement of BMWE-represented employees, this procedural error was waived.
 
 
 46
 The judgment of the district court is reversed and the case is remanded with directions to enter judgment enforcing the awards.
 
 
 47
 KENNEDY, Circuit Judge, dissenting.
 
 
 48
 I do not disagree with the majority's legal analysis, but rather with the conclusion that the Board confined itself to matters within its jurisdiction. The jurisdiction of the Board is determined by the arbitration agreement between the parties because the "major objective of the Railway Labor Act was to avoid industrial strife by submitting disputes to the adjustment boards for arbitration. The special boards' jurisdiction is limited to the jurisdiction that is conferred thereupon by the agreement between the carrier and the union." Jones v. St. Louis-San Francisco Ry. Co., 728 F.2d 257, 264 (6th Cir.1984). The agreement between appellee CSX Transportation, Inc. (CSX) and appellant United Transportation Union (UTU) set out three areas for which the Board would not have jurisdiction: "The Board shall not have jurisdiction of disputes growing out of requests for changes in rates of pay, rules or working conditions nor have authority to change existing agreements or establish new rules."
 
 
 49
 As the majority acknowledges, the collective bargaining agreement gave CSX the exclusive authority to determine which control mechanism should be employed at the construction sites.[1] For many, many years CSX had used train orders and proceed signals at some construction sites.
 
 Operating Rule 707(f) provides:
 
 50
 When conditions will not permit turning the track over to Work Force(s) as prescribed in Rules 707(c) and 707(d), or if the nature of the work may cause equipment to foul adjacent tracks, work by Work Force(s) may be performed under traffic without flag protection by use of a train order. During the time specified in the train order, all trains will move within the work limits prepared to stop within one-half the range of vision and not proceed beyond the point of work except on yellow hand proceed signal or oral authority from employee in charge of work.
 
 
 51
 Joint App. at 42 (emphasis added). This rule clearly indicates a difference between the use of a train order and the use of flagmen to protect workers at a construction site. The choice of which to use is vested with CSX. CSX chose to issue a train order under this rule for trains at the Cumberland construction site. It also issued a Superintendent's Bulletin for the Akron construction site under Operating Rule 93, which provides that "[w]ithin yard limits, trains and engines ... must move prepared to stop within one-half the range of vision, not exceeding twenty (20) MPH unless the main track is known to be clear by block signal indication." Joint App. at 45. Thus, at both sites the trains were required to stop before proceeding either at the direction of a block signal indication or by hand signal or oral authority. In both situations, CSX made the decision not to use flag protection, but rather to protect workers by requiring trains to stop before proceeding or to otherwise verify that the tracks were clear.
 
 
 52
 It is axiomatic in cases such as this that the arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960) (quoted in Norfolk & Western Ry. Co. v. Brotherhood of Ry., Airline and Steamship Clerks, 657 F.2d 596, 600 (4th Cir.1981)). Moreover, "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law--the practices of the industry and the shop--is equally a part of the collective bargaining agreement although not expressed in it." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960).
 
 
 53
 Examining the Board's opinions in the two cases makes it clear that it decided in appellant's favor not by interpreting the agreement and applicable "shop law," but rather by deciding that flagging was necessary at both sites and that CSX should have used the claimants. It is telling to note that the Board framed the question as follows:
 
 
 54
 The issue here in dispute, as we view it, concerns more the contention of the Organization [UTU] that there was a need for flag protection at the construction site regardless of the type of mechanical equipment or cranes being used by the contractor and that the Claimant or Claimants should have been called for such work.
 
 
 55
 Joint App. at 13 (emphasis added). The Board thus decided the need for flagging, not simply whether non-UTU flagmen were being used.[2] The Board found that the "circumstances of [the] record support the conclusion that a flagging service was both needed and essentially being performed outside the scope of the recognized duties of train service employees." Id. As noted above, however, deciding the need for flagmen is vested with the discretion of CSX. Timken Co. v. Local Union No. 1123, United Steelworkers of America, AFL-CIO, 482 F.2d 1012, 1015 n. 2 (6th Cir.1973) held that "if the arbitrator under[takes] to, in effect, ... substitute his own discretion for that of the parties or to dispense 'his own brand of industrial justice,' the enforcement of the award must be denied" (citation omitted). Here, the Board substituted its discretion with regard to the need for flagmen for that of CSX. As in Timken, the Board acted without jurisdiction by exceeding the scope of the arbitration agreement.
 
 
 56
 While I recognize that interpretation of the arbitration agreement is the unique function of the Board and that its interpretation should not be easily set aside by a reviewing court, the fact that the Board failed to consider either the contract language or the "law of the shop" here expressed in written rules which vested authority with CSX to determine whether to use flagmen or issue train orders at construction sites, is a decision outside its scope of authority. Not only does it not draw its essence from the contract, but it also serves to change a substantive rule regarding flag protection--that is, that CSX no longer has discretion to choose the means of protecting workers. "This Court has consistently adhered to the principle that an arbitrator may construe ambiguous contract language, but lacks authority to disregard ... plain or unambiguous contract provisions." Sears, Roebuck & Co. v. Teamsters Local Union No. 243, 683 F.2d 154, 155 (6th Cir.1982). See also Clinchfield Coal Co. v. District 28, United Mine Workers of America & Local Union No. 1452, 720 F.2d 1365, 1369 (4th Cir.1983) ("Where ... the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract").
 
 
 57
 I would AFFIRM the judgment of the District Court.
 
 
 58
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 59
 I concur in parts I, II, and IV of Judge Lively's opinion, but I dissent from part III and join with Judge Kennedy's resolution of that issue. I believe, as Judge Kennedy concluded, that the Board actually decided the need for flagging rather than the question that was properly before them.
 
 
 
 [1]
 The majority says that the agreement did not give unqualified discretion to CSX because "Rule 707(f) does not provide an alternative to flagging in all circumstances and under all conditions." It then concludes that if those conditions are not met, use of train orders does not eliminate the requirement for flagging protection. It is important to note, however, that in neither the Cumberland suit nor in the Akron suit was the existence of conditions giving CSX discretion ever contested by the union
 
 
 [2]
 Both parties concede that if flagmen were being used at the sites, the claimants would be entitled to their awards. I would emphasize that the relevant question for the Board was whether flagmen were used, not whether they should have been used